**The BLACK DOG TAVERN COMPANY, INC., Plaintiff,**

v.

**J. Peter HALL d/b/a Basement Designs, Inc., et al., Defendants.**

**Civ. A. No. 92–11905–T.**

United States District Court, D. Massachusetts.

June 3, 1993.

Philip X. Murray, Lorusso & Loud, Boston, MA, for Black Dog Tavern Co., Inc.

Robert R. Terrell, Hill & Barlow, Boston, MA, for Peter Hall.

## MEMORANDUM

TAURO, Chief Judge.

Plaintiff, The Black Dog Tavern Company, Inc. ("The Black Dog Tavern"), brings this action against defendant J. Peter Hall ("Hall"), ·alleging: (1) trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (2) common law trademark infringement; (3) unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (4) common law unfair competition, (5) unfair and deceptive trade practices under Mass.Gen.L. ch. 93A; and (6) dilution of plaintiff's marks and injuries to its

business reputation under Mass.Gen.L. ch. 110B.

Defendant asserts a counterclaim seeking: (1) a declaratory judgment concerning the parties' rights; (2) damages for plaintiff's alleged intentional interference with defendant's advantageous business relations; and (3) damages for plaintiff's alleged unfair competition and unfair and deceptive trade practices under Mass.Gen.L. ch. 93A.

Presently before the court are the parties' cross motions for summary judgment.

## I.

### BACKGROUND

As presently developed, the record yields the following facts. In the early 1970s, plaintiff opened a restaurant and bakery shop on Martha's Vineyard ("the Vineyard"), an island off the coast of southeastern Massachusetts. Plaintiff's establishments, and the goods and services provided therein, came to be identified by the term "The Black Dog" and a corresponding design of a black dog (the "Black Dog Design"). *See* Appendix A.

In the latter part of the decade, plaintiff expanded its business to include the sale of T-shirts with the Black Dog Design printed on the front and the phrase "The Black Dog, Martha's Vineyard" printed on the back, together with the year the shirt was purchased. Since then, thousands of visitors to the Vineyard—many of whom arrive on ferries out of Woods Hole, Falmouth, Hyannis and New Bedford—have returned to the mainland with T-shirts emblazoned with plaintiff's ubiquitous canine. Sales of Black Dog clothing and novelty items,[1] which are available only on plaintiff's premises or through its mail order catalog, have grown steadily and now account for approximately forty percent of plaintiff's annual revenues.

In October of 1989, plaintiff registered the term "THE BLACK DOG" and the Black Dog Design as federal service marks (Reg. Nos. 1,559,349 and 1,561,546, respectively) for its restaurant and bakery shop services. In April of 1990, plaintiff registered the term "THE BLACK DOG" as a federal trademark (Reg. No. 1,593,194) for jellies and preserves, tinned cookies and bakery goods.

The proliferation of plaintiff's marks has not gone unnoticed among the island's full-time residents, one of whom is defendant Hall. Since moving to the Vineyard in 1986, Hall has operated a silkscreen printing business out of the basement of his home.[2] In July of 1990, he began selling T-shirts with an upside-down version of plaintiff's Black Dog Design (the "Upside–Down Dog Design") printed on the front and the phrase "The Dead Dog, Martha's Vineyard 1990" printed on the back in a typeface similar to that used on plaintiff's Black Dog T-shirts. Unamused by Hall's moribund mongrel, plaintiff requested Hall to cease all sales, production and distribution of his new T-shirts. Following negotiations, Hall agreed and stopped selling T-shirts bearing the Upside–Down Dog Design.

In August of 1990, Hall began selling a new T-shirt, this one bearing the design of a black hog (the "Black Hog Design"), *see* Appendix B, on the front and the phrase "The Black Hog, Martha's Vineyard 1990" on the back. Once again, Hall chose a typeface similar to that used on the back of plaintiff's Black Dog T-shirts. Before long, plaintiff contacted Hall and objected to his porcine product. But, Hall continued to sell the shirts, and the summer drew to a close with the dispute unresolved.

On September 4, 1990, Hall registered "The Black Hog" silkscreen print with the United States Copyright Office (Reg. No. 190–312). On October 30, 1990, plaintiff registered the Black Dog Design as a federal trademark (Reg. No. 1,620,023) for clothing—namely, hats, T-shirts, sweatshirts and shorts.

---

1. Plaintiff's inventory now includes, *inter alia*, tank tops, sweatshirts, polo shirts, sweat pants, shorts, aprons, sunglasses, appointment books, wooden signs, blankets, fanny packs, dish towels, maple syrup, granola, tote bags, beach towels, beach balls, beach umbrellas, mugs, dog bowls, lapel pins, stuffed toys, cookies, jams and dog biscuits.

2. In July of 1992, Hall incorporated his printing business under the name Basement Designs, Inc.

The following year, Hall resurrected his Dead Dog T-shirt, only this time in a somewhat different form. He replaced the Upside–Down Dog Design on the front of the T-shirt with the depiction of a dog's skeleton (the "Dead Dog Design"). *See* Appendix C. Apparently, the year was printed on some, but not all, of the new Dead Dog T-shirts. Hall registered "The Dead Dog" silkscreen print with the United States Copyright Office (Reg. No. 207–686) on July 29, 1991.

During the summer of 1991, Hall marketed both his Dead Dog T-shirts and his Black Hog T-shirts at flea markets, street fairs and a handful of Martha's Vineyard retail stores owned by Famous–Fraternity Sportswear Company ("Famous Sportswear"). On September 5, 1991, plaintiff's attorney sent a letter to Famous Sportswear, requesting that it cease selling Hall's shirts. By letter dated September 30, 1991, Famous Sportswear expressed a willingness to comply with plaintiff's request. With the summer at an end, plaintiff did not pursue the matter further.

In 1992, Hall once again marketed his Black Hog and Dead Dog T-shirts on the Vineyard.[3] Unwilling to share the island's T-shirt market with such a diversity of animal designs, plaintiff initiated this action against Hall and Famous Sportswear on August 4, 1992. Two days later, this court heard arguments on plaintiff's motion for a temporary restraining order, which was denied.

Soon thereafter, Famous Sportswear contacted Hall and asked him to pick up his unsold merchandise and issue a refund. Hall agreed to do so, and Famous Sportswear subsequently entered into a stipulation of dismissal with plaintiff. Hall, on the other hand, answered plaintiff's complaint and asserted a counterclaim. Thereafter, the parties filed the motions for summary judgment which are now before the court.

---

3. By this time, Hall was also printing his Black Hog and Dead Dog marks on sweatshirts and hats.

4. "Service marks and trademarks are similar yet distinct creatures." *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 23 n. 1 (1st Cir.1989). The former are used to distinguish one's services, while the latter are used to distinguish one's

## II.

### SUMMARY JUDGMENT STANDARD

"While infringement and unfair competition cases often present factual issues that render summary judgment inappropriate, this is not invariably so." *Kazmaier v. Wooten,* 761 F.2d 46, 48–49 (1st Cir.1985). *See also Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 486 (1st Cir.1981) ("While summary disposition is usually inappropriate in complex infringement and unfair competition cases, it is not unheard of."). Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "A factual dispute is material if it 'affects the outcome of the litigation,' and genuine if manifested by 'substantial' evidence 'going beyond the allegations of the complaint.'" *Pignons,* 657 F.2d at 486 (quoting *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976)). "In passing on a summary judgment motion, the court must view the record and draw inferences in the light most favorable to the opposing party." *Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 815 (1st Cir.1987) (citations omitted).

## III.

### PROTECTED STATUS OF MARKS

 As a preliminary matter, the court must determine whether plaintiff's registered marks[4] are entitled to protection. It is well established that "[t]rademark rights do not generally arise from registration." *Id.* at 815; *see Planned Parenthood Fed'n, Inc. v. Problem Pregnancy of Worcester, Inc.,* 398

---

goods. *See* 15 U.S.C. § 1127. Both are "used to indicate the distinctive source of … goods or services, even if that source is unknown." *Sullivan,* 867 F.2d at 23 n. 1 (citation omitted). The distinction between the two types of marks does not affect the analysis in this case. Accordingly, the court will refer to plaintiff's service marks and trademarks collectively as "marks."

Mass. 480, 486, 498 N.E.2d 1044, 1048 (1986). Such rights, which accrue from the prior usage of a mark, find their source in the common law. *Volkswagenwerk,* 814 F.2d at 816; *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 372 (1st Cir.1980). Nevertheless, registration does serve an important evidentiary function. Under the Lanham Act, registration of a mark is prima facie evidence of "the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration." 15 U.S.C. § 1115(a).[5]

■ In the context of the present case, the registration of plaintiff's marks creates a presumption that they are entitled to protection. Defendant, in an attempt to overcome this presumption, contends that plaintiff's marks are merely functional and, therefore, not entitled to protection. *See Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.,* 626 F.2d 193, 195 (1st Cir.1980) ("[F]unctional features which are not the subject of a valid patent or copyright may be imitated with impunity."); *Keebler,* 624 F.2d at 378. In support of this contention, defendant argues that "[p]eople purchase [Black Dog] T-shirts not because they desire a T-shirt which they are assured originated with The Black Dog Tavern, but because they want a T-shirt with an image of a dog they consider pleasing." Def.'s Mem. Supp.Summ.J. at 9.

■ The court finds no merit to this argument. The evidence proffered by plaintiff clearly establishes that people buy Black Dog T-shirts precisely because they associate them with plaintiff's establishments. *See* Pl.'s Mem.Supp.Mot.T.R.O. Ex. E (letters and photos from purchasers of Black Dog apparel). Where, as here, a mark indicates source, its "aesthetic functionality" cannot preclude a finding of nonfunctionality. *See*

*Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts,* 944 F.2d 1235, 1247 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992). Accordingly, the court finds that defendant has failed to overcome the presumption created by plaintiff's registration of its marks.

■ Even if plaintiff's marks were not registered, the record would support the conclusion that plaintiff has acquired an exclusive right to use them. "Whether a particular ... mark is entitled to legal protection depends on whether it is classified, in ascending order of eligibility for protection, as (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary and fanciful." *Calamari Fisheries, Inc. v. Village Catch, Inc.,* 698 F.Supp. 994, 1006 (D.Mass.1988) (citing *S.S. Kresge Co. v. United Factory Outlet, Inc.,* 598 F.2d 694, 696 (1st Cir.1979)). Plaintiff's marks are properly classified as "arbitrary or fanciful," as they "bear no logical or suggestive relation to the actual characteristics of the goods or services" offered by plaintiff. *Id.* at 1007.[6] Rather, "their intrinsic nature serves to identify a particular source of a product." *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992). Plaintiff's marks, therefore, "are deemed inherently distinctive and are entitled to protection." *Id.*

## IV.

### *TRADEMARK INFRINGEMENT*

■ Having concluded that plaintiff has enforceable rights in its marks, the court now turns to its claims of trademark infringement. Although plaintiff's claims are brought under both section 32(1) of the Lanham Act[7] and the common law, the analysis

---

5. This right becomes incontestable if the registered mark is used continuously for five consecutive years subsequent to the date of registration. 15 U.S.C. § 1065. In such a case the registration is deemed to be conclusive evidence of the registrant's exclusive right to use the mark. *Id.* § 1115(b). Because plaintiff's marks were registered between October of 1989 and October of 1990, its rights to use them have not yet become incontestable under the Lanham Act.

6. For example, it can hardly be suggested that the name "The Black Dog Tavern" alludes to a dish on plaintiff's menu.

7. In relevant part, section 32(1) of the Lanham Act provides:
 Any person who shall, without the consent of the registrant—
 (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of

required by each is largely the same. Whether brought under state or federal law, the central issue in most infringement cases—including this one—is whether the allegedly infringing use creates a likelihood of confusion. *See Sullivan,* 867 F.2d at 28 (claims under Lanham Act); *Pignons,* 657 F.2d at 486–87 (claims under Lanham Act and Mass.Gen.L. ch. 110B, § 11); *Planned Parenthood,* 398 Mass. at 488, 498 N.E.2d at 1049 (common law claims).

In the "typical" trademark infringement case, the likelihood of confusion inquiry centers on whether members of the purchasing public are likely to mistake one party's products or services for another party's protected products or services within the same category. *Sullivan,* 867 F.2d at 28. *See Franks v. Markson,* 337 Mass. 278, 149 N.E.2d 619 (1958) ("The ultimate test . . . is whether there is a reasonable probability that the buying public will confuse one [mark] with the other so that they will be induced to purchase [defendant's] merchandise in the belief that it is [plaintiff's]."). In the context of this case, this aspect of the inquiry becomes whether consumers are likely to purchase defendant's Black Hog or Dead Dog T-shirts in the mistaken belief that they are purchasing plaintiff's Black Dog T-shirts.

In some infringement cases, the likelihood of confusion inquiry also focuses upon whether members of the purchasing public are likely to believe that the plaintiff produces, licenses, or otherwise endorses the defendant's products. *Sullivan,* 867 F.2d at 28–29. *See WCVB–TV v. Boston Athletic Ass'n,* 926 F.2d 42, 44 (1st Cir.1991) ("Trademark law prohibits the unauthorized use of . . . a mark, but *only* where doing so creates a

'likelihood of confusion' about who produces the goods or provides the service in question." (emphasis in original)); *Pignons,* 657 F.2d at 490 ("Confusion over the nature of the parties' business relationship may be as objectionable for purposes of trademark infringement as is confusion between their goods."). In the present case, it is this latter type of confusion with which plaintiff seems most concerned. *See* Compl. ¶¶ 28–31 (alleging likelihood of confusion "as to the sponsorship, affiliation, association and origin of Defendant's goods.").

■ In assessing likelihood of confusion, the First Circuit has consistently considered eight different factors: (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark. *Sullivan,* 867 F.2d at 29; *Volkswagenwerk,* 814 F.2d at 817; *Pignons,* 657 F.2d at 487.[8] "No one factor is necessarily determinative, but each must be considered." *Keds Corp. v. Renee Int'l Trading Corp.,* 888 F.2d 215, 222 (1st Cir. 1989) (citing *Volkswagenwerk,* 814 F.2d at 817).

### A. *Similarity of the Marks*

■ "[S]imilarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features." *Pignons,* 657 F.2d at 487 (citations omitted). Marks may be recognized as similar based on their appearance, sound and meaning. *Calamari,* 698 F.Supp. at 1009.

---

any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive

. . . .

shall be liable in a civil action by the registrant for the remedies hereinafter provided.
15 U.S.C. § 1114(1).

**8.** Other circuits have compiled similar lists of factors. *See, e.g., W.W.W. Pharmaceutical Co. v. Gillette Co.,* 984 F.2d 567, 572 (2d Cir.1993) (listing 8 factors); *Dakota Industries, Inc. v. Dakota Sportswear, Inc.,* 988 F.2d 61, 64 (8th Cir. 1993) (listing 6 factors); *Metro Publishing, Ltd. v. San Jose Mercury News,* 987 F.2d 637, 640 (9th

Cir.1993) (listing 8 factors); *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 959 (7th Cir.1992) (listing 7 factors), *cert. denied,* — U.S. —, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993); *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 293 (3d Cir.) (listing 10 factors), *cert. denied,* — U.S. —, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1106 (6th Cir.1991) (listing 8 factors); *Weiss Associates, Inc. v. HRL Associates, Inc.,* 902 F.2d 1546, 1548–49 (Fed.Cir.1990) (listing 13 factors).

*See Sullivan,* 867 F.2d at 29 ("Meaning alone ... may be sufficiently close to constitute similarity."); *Volkswagenwerk,* 814 F.2d at 817 ("[A] finding of similarity may be based on appearance alone."). The similarity of the marks must be considered "in light of what occurs in the marketplace, taking into account the 'circumstances surrounding the purchase of the goods' or services." *Calamari,* 698 F.Supp. at 1009 (quoting *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.,* 616 F.2d 440, 444 (9th Cir. 1980)).

Plaintiff's Black Dog Design depicts what its name suggests, a black dog. The animal—whose breed the court is unable to discern—is oriented to the left with its head up and its tail curved slightly upward. Touches of white can be seen on its muzzle, paws and collar.

Like the Black Dog Design, defendant's Black Hog Design depicts a black quadruped facing to the left. For the most part, the similarity ends there. Unlike plaintiff's somewhat noble depiction of man's best friend, defendant's swine strikes a less inspiring pose. Its tail—such as it is—and its snout are pointing downward. In addition, the curvature of its back and its overall corpulence stand in sharp contrast to the stature of plaintiff's dog.

The Dead Dog Design also bears little resemblance to the Black Dog Design. Although the stance of defendant's skeletal dog is similar to that of plaintiff's black dog, the two dogs face in opposite directions. More significantly, the bony make-up of defendant's dog creates an image quite distinct from that of plaintiff's canine rendition.

The written marks utilized by the parties share some common characteristics. Each is comprised of three monosyllabic words: the definite article, an adjective, and a noun denoting an animal. Also, each is printed in the same typeface and appears above the term "Martha's Vineyard" and, in most instances, the year. "The Black Dog" and "The Black Hog" are most alike in sound and appearance, differing only by one letter. "The Dead Dog" is less similar on both counts, owing to its use of "Dead," instead of "Black," to modify "Dog."

Despite their phonetic similarities, the parties' written marks, like their corresponding designs, connote very different meanings. Color notwithstanding, a dog and a hog are two very different creatures, unlikely to be confused in the average person's mind. Likewise, it can hardly be suggested that a typical consumer will not distinguish the macabre overtones of "The Dead Dog" from the more salutary connotations of "The Black Dog."

Viewed in their totality, defendant's marks are not sufficiently similar to plaintiff's in appearance, sound or meaning to create a substantial likelihood of confusion. "[W]hile the similarity of the words used in the mark[s] would support an inference of likelihood of confusion, ... the striking dissimilarities in the designs used in the marks greatly outweigh any similarities." *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1485 (10th Cir.1987).

B. *Similarity of the Goods*

All of the goods on which defendant's allegedly infringing marks appear—T-shirts, sweatshirts and hats—can also be found in plaintiff's inventory. This fact increases the likelihood of confusion among the buying public. *See Sullivan,* 867 F.2d at 30.

C. *Relationship Between the Parties' Channels of Trade*

D. *Relationship Between the Parties' Advertising*

E. *Classes of Prospective Purchasers*

Following the example of the Court of Appeals for the First Circuit, this court will treat these three factors as related. *See, e.g., Volkswagenwerk,* 814 F.2d at 818.

Defendant sells his goods at flea markets, street fairs and independent retail shops on the Vineyard. Up to now, his advertising effort has consisted of displaying his T-shirts at the above outlets. Plaintiff's goods, on the other hand, are marketed in a much more sophisticated and focused manner. Plaintiff offers them only at its bakery or through its mail order catalog, which it sends to custom-

ers throughout the United States and Canada. Unlike defendant, plaintiff has advertised extensively through magazines and newspapers, as well as on the radio. Notwithstanding the parties' geographical proximity, there is minimal overlap between either their channels of trade or their advertising.

The class of prospective purchasers of each party's goods is virtually the same: all visitors to and residents of the Vineyard.[9] Ordinarily, this fact would point toward a greater likelihood of confusion. *See Sullivan,* 867 F.2d at 30; *Volkswagenwerk,* 814 F.2d at 818. Here, however, the relative sophistication of the consumers involved warrants consideration. Those most likely to buy Black Dog T-shirts—*i.e.,* those familiar with and fond of The Black Dog Tavern—are also least likely to be confused by any similarities between plaintiff's and defendant's marks. *See Pignons,* 657 F.2d at 489 ("Courts have found less likelihood of confusion where goods are expensive and purchased after careful consideration.").

### F. *Actual Confusion*

■ "A showing of actual confusion is not essential in order to find a likelihood of confusion." *Volkswagenwerk,* 814 F.2d at 818 (citations omitted). But, the lack of evidence of actual confusion, when the marks have been in the same market, may indicate that there is little likelihood of confusion. *See Pignons,* 657 F.2d at 490; *Gruner + Jahr USA Publishing, Div. of Gruner + Jahr Printing & Publishing Co. v. Meredith Corp.,* 793 F.Supp. 1222, 1232–33 (S.D.N.Y. 1992), *aff'd,* 991 F.2d 1072 (2d Cir.1993).

As evidence of actual confusion, plaintiff offers the affidavit of Mary Alarie, whose advertising specialty company does business with plaintiff. She states that during the summer of 1992, while riding in a cab on the Vineyard, she overheard another passenger refer to plaintiff's bakery as "the Dead Dog place." Even if admissible,[10] this isolated comment is not persuasive evidence of actual confusion. Ms. Alarie's affidavit says little about the context of the conversation, other than that it took place while the cab was driving by plaintiff's premises.

Plaintiff also offers the affidavit of Marianne Neill, who has been plaintiff's screen printer for approximately twelve years. She states that during the past two years, people have entered her shop asking for Dead Dog and Black Hog items. Such requests are not indicative of customer confusion. Ms. Neill does not print shirts exclusively for plaintiff, and it is reasonable to infer that some potential customers visited her print shop with the expectation that defendant's alternative designs were included in her product line.

Finally, the general manager of The Black Dog Tavern testified that during the summer of 1991 he received a telephone call from someone who wanted to order a Dead Dog T-shirt.[11] The strength of this evidence is minimal, at best. As the First Circuit has observed, "a single misdirected communication is very weak evidence of consumer confusion." *Pignons,* 657 F.2d at 490. Moreover, that inquiry demonstrated no product confusion on the caller's part. He clearly wanted a Dead Dog T-shirt, and not a Black Dog T-shirt.

Overall, plaintiff's evidence is not significantly probative of actual confusion. Even when viewed in the light most favorable to plaintiff, it points to relatively few incidents of actual consumer confusion since defendant began marketing his Dead Dog and Black Hog T-shirts. Given that both parties' goods have been simultaneously on sale for over two years, the court finds that the absence of more evidence of actual confusion weighs against a finding of likelihood of confusion. *See Pignons,* 657 F.2d at 490–91; *Pump, Inc. v. Collins Management, Inc.,* 746 F.Supp. 1159, 1169–70 (D.Mass.1990).

---

9. The class of prospective purchasers of plaintiff's goods also includes individuals who receive plaintiff's catalog without ever visiting the Vineyard.

10. Because the passenger's statement is not offered to prove what it asserts, but rather to show what the passenger believed, it is not hearsay. *See* Fed.R.Evid. 801(c); *Sullivan,* 867 F.2d at 31.

11. *See* Deposition of Joseph B. Hall at 90–92.

## G. *Defendant's Intent*

From the record, it is clear that defendant, in creating his Black Hog and Dead Dog T-shirts, intended to parody plaintiff's Black Dog T-shirts.[12] His designs fit a conventional definition of trademark parody. They embody "a simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner." *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 34 (1st Cir.), *cert. denied*, 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987).

█ When confronted with trademark parody, some courts have adopted a balancing test, weighing the public interest in avoiding consumer confusion against the public interest in free expression. *See, e.g., Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.*, 886 F.2d 490 (2d Cir.1989) (considering the multifactor likelihood of confusion analysis "at best awkward in the context of parody"). Absent contrary guidance from the Court of Appeals for the First Circuit, this court sees no reason to abandon the present likelihood of confusion analysis, "provided that it is applied with special sensitivity to the purposes of trademark law and the First Amendment rights of [defendant]." *Anheuser–Busch, Inc. v. Balducci Publications*, 814 F.Supp. 791, 795–96 (E.D.Mo.1993).

"[W]here a party chooses a mark as a parody of an existing mark, the intent is not necessarily to confuse the public but rather to amuse." *Jordache*, 828 F.2d at 1486. Of course, the mere fact that a party intends to create a parody does not preclude the possibility of confusion. Indeed, "[a] parody which causes confusion in the marketplace implicates the legitimate commercial and consumer protection objectives of trademark law." *L.L. Bean*, 811 F.2d at 32 n. 3.

As the Court of Appeals for the Second Circuit has observed:

A parody must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is *not* the original and is instead a parody. To the extent that it does only the former but not the latter, it is not only a poor parody but also vulnerable under trademark law, since the customer will be confused.

*Cliffs Notes*, 886 F.2d at 494 (emphasis in original). *See also Jordache*, 828 F.2d at 1486 ("A parody relies upon a difference from the original mark, presumably a humorous difference, in order to produce its desired effect."); *Elsmere Music, Inc. v. National Broadcasting Co.*, 623 F.2d 252, 253 n. 1 (2d Cir.1980) (per curiam) ("[A] parody frequently needs to be more than a fleeting evocation of an original in order to make its humorous point.").

█ In this case, the court finds that defendant's Black Hog and Dead Dog marks convey just enough of plaintiff's Black Dog marks to allow an ordinarily prudent consumer to appreciate the point of the parody, thereby diminishing the risk of confusion. *See Anheuser–Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 321 (4th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992). *Cf. Yankee Publishing Inc. v. News America Publishing Inc.*, 809 F.Supp. 267 (S.D.N.Y.1992) (finding that defendant's caricature of plaintiff's trade dress "made it sufficiently clear to consumers that it was a joke and not a trademark source identifier"); *Tetley, Inc. v. Topps Chewing Gum, Inc.*, 556 F.Supp. 785 (E.D.N.Y.1983) ("[T]he very heavy handedness of defendant's parody would appear to assure that a clear distinction will be preserved in a consumer's mind....").[13] The fact that defen-

---

**12.** In his affidavit, defendant has the following to say about the message he intended to convey through his T-shirts:

Given the growing commercialization of the black dog image, and its apparent popularity among tourists, ... I decided that The Black Dog and its T-shirt were appropriate objects for satirical comment and parody.... Because of the large number of Black Dog T-shirts visible on the Island, ... I thought that

some people might want to express their aversion to following the crowd or participating in a fad by wearing a distinctive T-shirt that comments on the trend.

Affidavit of J. Peter Hall at 3.

**13.** Two recent trademark cases that also involved T-shirt designs, *Nike, Inc. v. "Just Did It" Enterprises*, 799 F.Supp. 894 (N.D.Ill.1992), and *Hard Rock Cafe Licensing Corp. v. Pacific Graphics, Inc.*, 776 F.Supp. 1454 (W.D.Wash.1991), are

dant's parody appears on products that are sold for profit does not alter this conclusion. This is not a case in which the defendant's spoof is "subservient and only tangentially related" to a primarily commercial message. *See White v. Samsung Electronics America, Inc.,* 971 F.2d 1395, 1401 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2443, 124 L.Ed.2d 660 (1993).

### H. *Strength of Plaintiff's Mark*

"Factors useful in determining a trademark's relative strength include the length of time a mark has been used and the plaintiff's relative renown in its field; the strength of the mark in plaintiff's field of business, especially by looking at the number of similar registered marks; and the plaintiff's actions in promoting its mark." *Tanel Corp. v. Reebok Int'l, Ltd.,* 774 F.Supp. 49, 55 (D.Mass. 1990) (citing *Sullivan,* 867 F.2d at 32). Consideration of these factors leads to the ineluctable conclusion that plaintiff's marks are strong, particularly on the Vineyard.

Plaintiff's Black Dog marks have been appearing on T-shirts and other items for well over a decade. In that time, the marks have become quite popular and widely known. They have gained exposure not only through plaintiff's advertising, but also through write-ups in such magazines as *Rolling Stone, Gourmet* and *Cape Cod Life.* Indeed, it is the strength of plaintiff's marks which made them an object of defendant's parody. *Cf. Eveready Battery Co. v. Adolph Coors Co.,* 765 F.Supp. 440, 450 (N.D.Ill.1991) (finding that "the very strength of [plaintiff's] Energizer Bunny mark ... seem[ed] to weigh against a likelihood of confusion, particularly

distinguishable. In *Nike,* the court found that it was "not clear from viewing [defendant's] merchandise that it [was] intended as a parody." 799 F.Supp. at 898. In *Hard Rock Cafe,* the court explicitly found the case before it "different from those cases in which courts have found that the junior user's mark is a true parody." 776 F.Supp. at 1462. *But see Mutual of Omaha Ins. Co. v. Novak,* 836 F.2d 397 (8th Cir.1987) (affirming district court's finding of likelihood of confusion between parties' marks), *cert. denied,* 488 U.S. 933, 109 S.Ct. 326, 102 L.Ed.2d 344 (1988).

14. In relevant part, section 43(a) of the Lanham Act provides:

in light of the obvious parody depicted in defendant's use").

After analyzing and weighing each of these eight factors in light of the totality of circumstances presented here, this court finds that members of the purchasing public are not likely to confuse defendant's Black Hog or Dead Dog merchandise with plaintiff's Black Dog merchandise. Nor are ordinarily prudent consumers likely to believe that plaintiff produced or otherwise endorsed defendant's goods. Accordingly, defendant is entitled to summary judgment on plaintiff's claims of trademark infringement.

### V.

### UNFAIR COMPETITION

Plaintiff also alleges that defendant's use of the Black Hog and Dead Dog marks constitutes unfair competition under section 43(a) of the Lanham Act[14] and the common law. These claims of unfair competition, like plaintiff's claims of trademark infringement, must be supported by a showing of a likelihood of confusion. *Pignons,* 657 F.2d at 493; *Bayshore Group Ltd. v. Bay Shore Seafood Brokers, Inc.,* 762 F.Supp. 404, 415 (D.Mass. 1991); *NEC Electronics, Inc. v. New England Circuit Sales, Inc.,* 722 F.Supp. 861, 864 (D.Mass.1989) (citations omitted). *See Datacomm Interface, Inc. v. Computerworld, Inc.,* 396 Mass. 760, 489 N.E.2d 185 (1986) ("[T]he gravamen of an unfair competition claim is the likelihood of consumer confusion as to the source of the goods or services."). This court has determined that plaintiff has failed to demonstrate the existence of a likelihood of confusion among potential consumers. It

Any person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, ... which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person,

. . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

follows, therefore, that defendant is entitled to summary judgment on plaintiff's claims of unfair competition.

## VI.

### DILUTION

■ Plaintiff also brings a claim under the Massachusetts antidilution statute, which provides in relevant part:

Likelihood of injury to business reputation or of dilution of the distinctive quality of . . . a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

Mass.Gen.L. ch. 110B, § 12. To prevail under this provision, plaintiff must show that its marks are distinctive, and that defendant's use of similar marks has created the likelihood of dilution. *Pignons*, 657 F.2d at 493–94 (citation omitted). The court has already concluded that plaintiff's marks are distinctive. It remains, then, to determine whether the record supports a finding that defendant's use of the Black Hog and Dead Dog marks is likely to dilute the distinctive quality of the Black Dog mark.

■ A likelihood of dilution can result from any of the following: (1) injury to the value of a mark caused by actual or potential confusion; (2) diminution in the uniqueness and individuality of a mark; or (3) injury resulting from use of a mark in a manner that tarnishes or appropriates the goodwill and reputation associated with plaintiff's mark. *L.L. Bean*, 811 F.2d at 30 (citations omitted). This court's determination that there is no likelihood of confusion between the parties' marks precludes consideration of the first test for dilution. Accordingly, the court will concern itself with the latter two tests for dilution.

■ According to plaintiff, this case presents a "classic example" of trademark dilution. It argues that defendant's use of the Black Hog and Dead Dog marks will diminish the public's ability to identify the Black Dog marks with plaintiff's establishments. Plaintiff also maintains that defendant's use of his marks tarnishes its reputation. Specifically, plaintiff alleges that defendant's use of the term "Dead" serves to disparage the positive connotations plaintiff's mark has come to convey in conjunction with plaintiff's food service business.

Assuming, for present purposes only, that either of these theories could serve as the basis for a finding of dilution, plaintiff has offered virtually no persuasive evidence to support them. The mere fact that defendant's use of his marks has been "continuous and ever-expanding," is not evidence that such use has either blurred the distinctiveness of plaintiff's marks or tarnished its reputation. Indeed, the fact that plaintiff's sales have increased every year since defendant began selling his shirts [15] would suggest that defendant's marks have had no such adverse effect. *Cf. LightHawk, Environmental Air Force v. Robertson*, 812 F.Supp. 1095, 1102 (W.D.Wash.1993) (finding that "[t]he use of Smokey Bear in political speech and parody is unlikely to diminish the value of Smokey Bear for forest fire prevention purposes").

In sum, "[t]here is simply not enough evidence to show that defendant's use of [his] trademark[s] . . . is likely to dilute plaintiff's trademark[s] under any of the interpretations of dilution recognized in this circuit." *PPG Industries, Inc. v. Clinical Data, Inc.*, 620 F.Supp. 604, 609 (D.Mass.1985).[16] Accordingly, defendant is entitled to summary judgment on plaintiff's claim of dilution.

## VII.

### MASS.GEN.L. CH. 93A

■ Finally, plaintiff alleges that defendant has engaged in unfair methods of com-

---

**15.** *See* Affidavit of Joseph B. Hall at 5–6.

**16.** In light of this finding, the court need not consider "the constitutional limits which might be imposed on the application of [Mass.Gen.L. ch. 110B, § 12] to unauthorized uses of trademarks on products whose principal purpose is to convey a message." *L.L. Bean*, 811 F.2d at 32,

n. 4. According to the First Circuit, such an analysis "undoubtedly would require a balancing of the harm suffered by the trademark owner against the benefit derived by the parodist and the public from the unauthorized use of a trademark on a product designed to convey a message." *Id.*

petition and deceptive trade practices in violation of Mass.Gen.L. ch. 93A. This claim warrants little discussion. Having already concluded that defendant was fully within his rights in parodying plaintiff's marks, the court finds that "even under the most critical view, [his] actions can hardly be described as 'immoral, unethical, oppressive, or unscrupulous.'" *Pump*, 746 F.Supp. at 1173 (quoting *Purity Supreme, Inc. v. Attorney General*, 380 Mass. 762, 777, 407 N.E.2d 297, 307 (1980)). *See also Bayshore*, 762 F.Supp. at 415 (linking plaintiff's 93A claim to its trademark infringement and unfair competition claims). Consequently, defendant is entitled to summary judgment on plaintiff's chapter 93A claim.

## VIII.

### HALL'S COUNTERCLAIM

In his counterclaim, Hall alleges that The Black Dog Tavern, through its September 5, 1991 letter to Famous Sportswear and its subsequent commencement of this action, intentionally and wrongfully interfered with his advantageous business relationship with Famous Sportswear. He also claims that plaintiff's interference, which allegedly cost him over 860 T-shirt sales, constituted unfair competition in violation of Mass.Gen.L. ch. 93A.

To prevail on either theory, Hall must prove that plaintiff's actions were somehow improper. *See United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 815–16, 551 N.E.2d 20, 23 (1990) (holding "improper" conduct to be an element of the tort of intentional interference with an advantageous business relationship); *Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979) (To be actionable under 93A, "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.").

Given the facts of this case and the current state of the applicable law,[17] the court finds no support for the contention that plaintiff's decision to bring this suit was somehow improper. The mere fact that plaintiff did not ultimately prevail on its claims does not mean that those claims were groundless. *See Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1513–14 (1st Cir. 1989); *Boothroyd Dewhurst, Inc. v. Poli*, 783 F.Supp. 670, 678 (D.Mass.1991). "It is clear ... that a party is justified in interfering with a third-party's contract with another by filing a lawsuit in a good faith effort to assert legally protected rights." *G.S. Enterprises, Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 273, 571 N.E.2d 1363, 1370 (1991). Absent evidence of bad faith, plaintiff is entitled to summary judgment on counts II and III of defendant's counterclaim.

## IX.

### CONCLUSION

For all of the foregoing reasons, this court finds that defendant's use of his Black Hog and Dead Dog marks is a parody of plaintiff's Black Dog marks having the intention and effect of amusing, rather than confusing, the public. Plaintiff's claims of infringement, unfair competition, dilution and deceptive trade practices, therefore, are dismissed.

There being no basis for defendant's allegations that it was improper for plaintiff to have initiated this action, counts II and III of his counterclaims are also dismissed.

An order will issue.

### ORDER

For the reasons stated in the accompanying memorandum, defendant's motion for summary judgment is hereby ALLOWED with respect to all counts of plaintiff's complaint and count I of defendant's counterclaim, and DENIED with respect to counts II and III of defendant's counterclaim. Plaintiff's motion for summary judgment is DENIED with respect to all counts of its complaint and count I of defendant's counterclaim, and ALLOWED with respect to counts II and III of defendant's counterclaim.

It is so ordered.

---

17. "Regretfully, the body of law relating to the Lanham Act has developed into a tangled morass. Courts struggling to move mountains often find they have only affected minuscule changes in trademark jurisprudence and occasionally have created their own likelihood of confusion." *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 171 (2d Cir.1991) (citation omitted).

APPENDIX A

APPENDIX B

© 1990 · BASEMENT DESIGNS

APPENDIX C