**FASHION VICTIM, LTD., Plaintiff,**

v.

**SUNRISE TURQUOISE,
INC., Defendant.**

No. 92 C 289.

United States District Court,
N.D. Illinois, E.D.

Feb. 21, 1992.

Robert B. Breisblatt, Gerald T. Shekleton, Welsh & Katz Ltd., Chicago, Ill., for plaintiff.

Anthony O. Cormier, Woodland Hills, Cal., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

This matter has been heard on the motion of Fashion Victim, Ltd. ("Fashion") for a preliminary injunction against Sunrise Turquoise, Inc. ("Sunrise"). After its early issuance of a temporary restraining order ("TRO") that has since been continued in effect by agreement between the parties, this Court has conducted a preliminary injunction hearing (the "Hearing" [1]) in which both Fashion and Sunrise were represented by counsel and presented evidence. Both parties have now provided this Court with their post-Hearing submissions. In accordance with Fed.R.Civ.P. ("Rule") 65 and Rule 52(a), this Court hereafter sets forth the findings of fact ("Findings") and conclusions of law ("Conclusions") that constitute the grounds of its action in ruling on Fashion's motion. To the extent (if any) that the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed

---

1. Citations to testimony at the Hearing will take the form "Tr.—." Exhibits will be cited as "PX—" or "DX—."

findings of fact, they shall also be considered Findings. In both those respects, see *Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985).

### Findings of Fact

1. Fashion is an Illinois corporation with its principal place of business located at 3328 North Clark Street, Chicago. Its business is the sale of T-shirts and jewelry (Tr. 10).

2. Fashion sells a T-shirt called "Skeleton Woopee," with a fanciful design depicting skeletons engaged in sexual activities (Tr. 13) in seven (although its own witness at the Hearing referred to six, Tr. 22) separate sexual positions (PX 2). Fashion has registered its copyright in the "Skeleton Woopee" design (PX 1).

3. "Skeleton Woopee" has become Fashion's number one seller among T-shirts (Tr. 14), representing approximately 20% of Fashion's T-shirt sales in 1990 and 27.8% in 1991 (Tr. 57). In 1990 Fashion spent approximately $12,000 in advertising its products, including the "Skeleton Woopee" T-shirt, and an additional $30,000 on trade shows at which the "Skeleton Woopee" T-shirt was displayed (Tr. 58). In 1991 those figures increased to approximately $15,000 in total advertising and $31,000 on trade shows (*id.*).

4. Although Fashion markets the "Skeleton Woopee" T-shirt in a number of color combinations, the primary combinations are black with white skeletons and white with black skeletons (Tr. 14). Fashion's best seller is the black shirt with white skeletons (Tr. 37).

5. Fashion advertises its "Skeleton Woopee" T-shirt in catalogs, weekly and biweekly flyers and at trade shows (Tr. 15). Its customers, most of whom buy the "Skeleton Woopee" T-shirt, are located all over the country (Tr. 18).

6. Since 1990 Fashion has sold in excess of 55,000 "Skeleton Woopee" T-shirts throughout the United States (Tr. 57). That includes a sale of four such T-shirts to the Peptab store in Louisville, Kentucky in early 1991 (Tr. 59, 61–62, PX 34). There

was however no evidence that anyone associated with Sunrise was aware of that sale or saw any of those T-shirts at Peptab or anywhere else in Louisville (see Tr. 84, 88, 105)—and given that single extremely small sale to a single Louisville customer, there is no reason to infer that any such awareness existed or that any such viewing took place.

7. Fashion sells the "Skeleton Woopee" T-shirt to retail stores and wholesalers at three prices—$5.50, $7.50 and $8.50 at the wholesale level—depending on the quality of the shirt (Tr. 17). Fashion maintains a check on the quality of all the shirts that it prints with the "Skeleton Woopee" pattern (Tr. 18).

8. Since it began marketing "Skeleton Woopee" T-shirts, Fashion has put parts or all of the "Skeleton Woopee" design on a number of other products: hats, bandanas, leggings, tank tops, bicycle shorts, sweatshirts, sweatpants, boxer shorts and coffee mugs (Tr. 24–30, PX 7–13, 15–21, 23–30).

9. At a New York trade show in January 1992, one of Fashion's customers came to its national sales manager William Wimble ("Wimble"), gave him a copy of Sunrise's catalog and said that "somebody else had a Skeleton Woopee shirt" (Tr. 19). Page 9 of the Sunrise catalog depicted a shirt that Wimble said "appeared to be the same as" the "Skeleton Woopee" T-shirt (Tr. 20, PX 4). At the New York show Sunrise prominently displayed its own T-shirts with skeletons in sexual positions (Tr. 22).

10. Since the New York show more than one customer (although Wimble could not recall the precise number, it appears to be very small) has approached Wimble and told him that someone else was selling the "Skeleton Woopee" T-shirt (Tr. 20). That most recently occurred at Chicago's McCormick Place gift show, where a customer said that she had bought the "Skeleton Woopee" from Sunrise for $36 a dozen (Tr. 21), a per-shirt price that was $4.50 less than Fashion's price. According to Sunrise's salesperson Daniel Reardon ("Reardon"), who also testified at the Hearing,

that $36 per dozen price was its "inventory clearance price" (Tr. 90). Since Fashion has become aware of the Sunrise shirt, the sales of "Skeleton Woopee" T-shirts have dropped (Tr. 22)—although Wimble did not quantify that asserted falloff, and it is plain that too short a period had elapsed between the January 1992 trade show and the Hearing (also in January) to reach any meaningful conclusion in that respect.

11. Sunrise is a corporation with its principal place of business in Louisville, Kentucky (Tr. 80). It is a national distributor of T-shirts and heat transfers that has been in business for over 12 years and employs between 150 and 200 persons (Tr. 87). Sunrise employs approximately 15 artists under the supervision of its art director Joseph Peck ("Peck") (Tr. 97) and has more than 1,000 T-shirt and transfer designs in its catalog (Tr. 117). It can turn out about 30,000 T-shirts daily with its printing equipment (Tr. 80–81).

12. In March or April 1991 a Sunrise customer told one of its salesmen, Reardon, in the course of a telephone conversation that the customer had seen a T-shirt depicting skeletons in a number of sexual positions, that the product was very popular, and that such a T-shirt would be a fast seller (Tr. 73, 85).[2] Reardon in turn left a note in Peck's in-house mailbox (such mailbox suggestions from salespeople to Sunrise's art department are a frequent source of product ideas, Tr. 98–99) that simply suggested that "skeletons in various sexual

positions would sell" (Tr. 74, 86). Peck then independently created the "Boners" design that appears as Item No. B–59W and B–59B in the Sunrise catalog (Tr. 101–03).

13. Sunrise's design is printed on shirts purchased from various sources (Tr. 90)—the one in evidence was made in Venezuela (Tr. 22, PX 3). It depicts skeletons in eight sexual positions,[3] six of which Fashion claims are the same as those on its "Skeleton Woopee" design (Tr. 23). That however is not a fair characterization of the actual evidence, based on an examination of the competing T-shirts themselves:

(a) Four depictions of sexual activity are common to the two competing T-shirts. That is scarcely surprising, for they deal with what might be expected to be produced by anyone who was given the generalized description conveyed by Pearson to Peck. Even those four, however, reflect some significant differences in the depictions—so much so as to negate entirely any notion of copying or palming off by Peck (and hence by Sunrise), and also to negate any inference of Peck's having had access to the "Skeleton Woopee" design to begin with.

(b) Three depictions (one of them showing skeletal intercourse in a standing position, another showing skeletal intercourse with the female skeleton atop the male and the third showing skeletal fellatio) appear in materially different forms in the two T-shirts.[4] Those differ-

---

2. It is certainly a reasonable inference, and this Court therefore finds, that the unidentified customer had seen the "Skeleton Woopee" T-shirt and that it served as the source of the customer's suggestion to Reardon. That does not however support the further inference that Reardon, Peck or anyone else at Sunrise had access to the "Skeleton Woopee" T-shirt itself, as contrasted with having been given the general idea of depicting skeletons by the customer. This Court draws no such inference—indeed, it finds to the contrary based on the evidence before it: Sunrise's customer did not refer either to Fashion or to "Skeleton Woopee" by name (Tr. 76), and this Court also credits the testimony of Reardon (Tr. 75–76) and Peck (Tr. 104–05) that neither was even aware of the existence of Fashion nor had either seen its "Skeleton Woopee" T-shirt before Peck designed Sunrise's competing product.

3. Again, as Wimble did with respect to his own "Skeleton Woopee" product (see Finding 2), the witnesses testified to different (and erroneous) numbers: Both Wimble (Tr. 23) and Sunrise's art director Peck (who designed the Sunrise T-shirt!) (Tr. 110–11) referred to seven positions as being shown on Sunrise's T-shirt.

4. It may again be noted (see Finding 2) that the total number of sexual-activity depictions ascribed to Fashion's "Skeleton Woopee" T-shirt in Findings 13(a) and (b) is seven, rather than the six asserted by Fashion's witness Wimble and by its counsel. Although both the count and the description are rendered somewhat more difficult by Fashion's portraying both male and female skulls as hairless (whereas Sunrise differentiates the skeletons by indicating some anatomical differences as well as by depicting a few long hairs on the female skulls), the description

ences even more strongly negate any notion or inference of the kinds referred to in the last sentence of Finding 13(a).

(c) Finally, one depiction in the Sunrise design really has no counterpart in the "Skeleton Woopee" design at all, even though it shows a version of sexual activity that is of sufficiently common knowledge so as scarcely to require that the artist be a student of the Kama Sutra to come up with the idea of its inclusion.[5] Both the conclusions referred to in the last sentence of Finding 13(a) are also supported a fortiori by that non-duplicative depiction.

14. Sunrise's design includes not only its repeated depictions of the various sexual positions but also the repeated word "Boners," with the letters of that word formed (not surprisingly) by stylized bones. It is unclear from the testimony of Fashion's witnesses whether it was before or after Peck had created Sunrise's design that Fashion produced another T-shirt with the copyrighted "Skeleton Woopee" graphics—this version also containing the printed motto "Just Bone Me" and also depicting scattered tombstones containing the words "The Boners" (Tr. 86–87, PX 17). But irrespective of the priority of production that may have been involved in the two products, this Court also finds no reasonable basis to infer Sunrise's having had access to *that* version of Fashion's T-shirts before Peck created the Sunrise T-shirt (see Tr. 87).[6] That lack of inference is especially appropriate given the obviousness of the play on words involved in the use of "Boner."

15. Fashion also lays stress on the fact that it has sold, since June 1990 (Tr. 31), a T-shirt called "Rat Lust" that depicts rats in sexual positions (PX 31). Sunrise sells a "RatZass!" T-shirt (its item B–90, PX 4 at

9) that Peck believed was also suggested by Reardon (Tr. 121), but Sunrise's version is entirely different (except for the nature of its general subject matter) from Fashion's version. Sunrise's product shows cartoon characters with stylized human bodies and animal heads (something that Peck was skilled at designing, Tr. 121)—a sort of sexual-activity version of Mickey and Minnie Mouse—while Fashion's product depicts much more realistic-looking (and less fanciful) animals engaged in sexual conduct. Even Fashion's Wimble acknowledged the total lack of similarity and the total lack of any possibility of confusion between the two products (Tr. 36). That entire subject matter is entirely nonprobative for present purposes.

## Conclusions of Law

All of the relevant criteria for issuance of a preliminary injunction are the same as the preconditions to issuance of a TRO, as previously stated in the TRO entered in this case. To make these Findings and Conclusions self-contained, this Court will copy or borrow freely from portions of the TRO (with necessary changes, of course).

1. *Jurisdiction and Venue.* This Court has subject matter jurisdiction of this action predicated on each of 28 U.S.C. §§ 1332, 1338(a) and 1338(b). Venue in this District is proper under each of 28 U.S.C. §§ 1391(b) and 1391(c).

2. *If Fashion were otherwise to prove itself entitled to preliminary injunctive relief, it would satisfy the necessary prerequisites of irreparable injury and the lack of an adequate remedy at law. Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 386 (7th Cir.1984) teaches that a lack of an adequate remedy at law is a precondition to any form

---

in the text appears entirely faithful to what appears on the Fashion T-shirt itself.

5. Nor does knowledge of that eighth variation require a federal judge to have been subjected, as all of us are, to the all-too-frequent action seeking forfeiture and destruction of magazines or videotapes, in which we are required to decide whether the subject matter of the forfeiture action is indeed obscene.

6. There is no evidence at all that Fashion's later-developed T-shirt was ever sold in Louisville, or that it appeared in any Fashion catalog before Peck created the Sunrise T-shirt. But even if it had, the Findings and Conclusions here would be no different.

of equitable relief. By its very nature, a claim of invasion of intellectual property such as a copyright or a trade dress demands injunctive relief if the value of that property is not to be destroyed by the alleged infringer. And the need for such injunctive relief is the paradigmatic example of the absence of an adequate remedy at law (see Owen Fiss & Doug Rendleman, *Injunctions* 59 (2d ed. 1984), cited in *Roland Machinery*, 749 F.2d at 386). Irreparable injury too "may normally be presumed from a showing of copyright infringement" (*Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 620 (7th Cir.1982)). Hence if Fashion had shown copyright or trade dress infringement, both these threshold components of preliminary injunctive relief would also have been established.

 3. *Fashion has wholly failed to demonstrate the requisite likelihood of success on the merits. Roland Machinery*, 749 F.2d at 387 requires that Fashion show "some likelihood of success on the merits" in the sense that its "chances are better than negligible." Although that is scarcely a demanding standard, it has not been met here, where this Court has heard the best evidence that Fashion has to offer and finds that all of the relevant facts run against Fashion and in favor of Sunrise:

(a) It is true that Fashion is the owner of a valid and enforceable copyright for its work entitled "Skeleton Woopee," as evidenced by United States copyright registration No. VA 437094 effective February 19, 1991. But it is black-letter law that the copyright monopoly is granted to the *expression* of an idea and not to the *idea itself.* Some aspects of the seminal decision in *Mazer v. Stein*, 347 U.S. 201, 218, 74 S.Ct. 460, 471, 98 L.Ed.

630 (1954) (footnotes omitted), with appropriate adaptations to fit the current facts, might well have been written for this case:

> Likewise a copyrighted directory is not infringed by a similar directory which is the product of independent work. The copyright protects originality rather than novelty or invention—conferring only "the sole right of multiplying copies." Absent copying there can be no infringement of copyright. Thus, respondents may not exclude others from using statuettes of human figures in table lamps; they may only prevent use of copies of their statuettes as such or as incorporated in some other article.[7]

As to copyright infringement, this Court has concluded that Sunrise did *not* have access to Fashion's registered copyrighted work, nor was Sunrise's product "substantially similar" to Fashion's (the two elements that are required to be shown for copyright infringement in the absence of proof of actual copying, *Atari*, 672 F.2d at 614). All of the differences (and they are numerous) between the competing designs negate any infringement, while all of the similarities are the natural result of the limitations of the subject matter—the idea itself. To grant Fashion a preliminary injunction under the circumstances here would impermissibly extend the protection of the law to the nonprotectible *idea* of depicting skeletons as engaged in sexual activity of various kinds.

 (b) Lanham Act § 43(a), 15 U.S.C. § 1125(a) has most recently given rise to a more generalized protection of "trade dress," a concept that has been described in this manner in *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 935 (7th Cir.1989) (citation omitted):

---

**7.** [Footnote by this Court] Despite its age (in comparative terms, given the modernity of most Supreme Court cases that this Court is called upon to cite), *Mazer* remains good law today. And the concept that it expresses was scarcely new when uttered—five years earlier, in the days before the Great Flood when this Court was Editor–in–Chief of the University of Chica-go Law Review, this Court assigned and then rewrote a staff member's note entitled *Common–Law Regulation of the Idea Market*, 16 U.Chi.L.Rev. 323 (1949), similarly confirming the lack of protection that is afforded to ideas as such rather than to their concretization in a particular form.

"Trade Dress" refers to the total image of a product, including features such as "size, shape, color or color combinations, texture, graphics, or even particular sales techniques." An infringement of the trade dress is proven if: (1) the plaintiff's trade dress is inherently distinctive or has acquired secondary meaning, (2) the plaintiff's trade dress is primarily nonfunctional, and (3) the defendant's trade dress is confusingly similar, engendering a likelihood of confusion in the marketplace.

That concept is ordinarily employed as an extension (or, perhaps more accurately, as simply a variant) of trademark protection rather than copyright protection—see the extended and informative exposition set out in *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 608–09 (7th Cir.1986). But what is critical for current purposes is that the legal protection afforded to "trade dress" also does not extend to an idea as such rather than to its embodiment, a principle that is expressed in the "trade dress" field by identifying the plaintiff's need to demonstrate the uniqueness of source associated with the claimed "trade dress" (*Roulo*, 886 F.2d at 936) (citations omitted)):

A mark or trade dress which is fanciful, arbitrary or otherwise distinctive is given protection more readily than a generic or descriptive trademark or trade dress that is functional since appropriation of generic words, marks or dress would prevent producers from accurately describing or denoting the quality or content of their goods. Hence common words necessary to describe the goods in question such as "greeting card" or a trade-dress element such as an envelope for a greeting card are not capable of appropriation, at least not in the absence of extraordinary evidence indicating secondary meaning, *i.e.*, that the common features have come to denote a single producer in the minds of the consuming public. It is therefore easier to secure protection for a fanciful mark or trade dress such as "Twinkie" than a more suggestive or descriptive mark such as "M–TV." When a trademark or trade dress is inherently distinctive or fanciful, it is unnecessary to make the further showing that the mark or dress has become associated with a single producer. If the mark is not distinctive such that a showing of secondary meaning is required, it is not necessary that the public be aware of the identity of the producer, but simply that the public associate the mark or dress with a single source.

It cannot fairly be said that Fashion's use of the theme of skeletons in sexual positions is "inherently distinctive" without giving that term the unacceptable meaning of granting a monopoly in the theme—the idea—itself. And as for secondary meaning, the few testified-to instances of Fashion's customers or possible customers having brought the existence of Sunrise's competing products to Fashion's attention did not demonstrate that—for those people *knew* that the competing product was Sunrise's. Relatedly, whatever minimal degree of claimed confusion (if any) may have existed was simply the result of familiarity of those few persons with the fact that Fashion had been first in the field of such skeletal-sex depictions. To treat that fact as somehow satisfying the further necessary condition of trade-dress protection—the likelihood of confusion (*Roulo*, 886 F.2d at 937)—would again impermissibly confer a monopoly on the idea alone.

In sum, Fashion has given the subject its best shot at this point. Although *Roland Machinery* and succeeding cases speak of a plaintiff's "better than negligible" chances as the required level of likelihood of success on the merits, that standard cannot be read to mean that Fashion is entitled to preliminary injunctive relief because it would be successful if only this Court had reached conclusions on the facts *opposite* from those that it has arrived at after full consideration of the evidence.

■■■■ 4. *Balancing of harms does not favor Fashion. Roland Machinery*, 749

F.2d at 387–88 teaches that there is a "sliding scale" relationship between the likelihood of success on the merits and the degree to which a plaintiff must demonstrate that it is favored by a balancing of the relative harms. As the principle was stated in *Ping v. National Education Ass'n,* 870 F.2d 1369, 1371 (7th Cir.1989), after quoting the likelihood-of-success language from *Roland Machinery:*

> If the movant can meet this threshold burden, the inquiry then becomes a "sliding scale" analysis of the harm to the parties and the public from the grant or denial of the injunction and the actual likelihood of success on the merits.

Here the harm that would be sustained by Fashion if preliminary injunctive relief were wrongfully *denied* would be that of its being subjected to competition in the free market, which would include the factor of Sunrise's lower price (and perhaps the lesser quality of its product), while the harm that would be sustained by Sunrise if preliminary injunctive relief were wrongfully *granted* would be the anticompetitive result of its being shut out of the market entirely. In light of the strength of the evidence that has been found to exist in Sunrise's favor, this Court exercises the "classic discretionary decision ... involving how much weight to give individual components of the calculus and to what direction the balance of equity tips" (*Lawson Products, Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1436 (7th Cir.1986)) by ruling in favor of the party toward whom all the evidence so strongly points: Sunrise.

■ 5. *Denial of a preliminary injunction best serves the public interest.* *Ping,* 870 F.2d at 1371 (which has also been quoted and relied on in such later cases as *National People's Action v. Village of Wilmette,* 914 F.2d 1008, 1010–11 (7th Cir. 1990)) refers to harm to the public, as well as to the parties, as a factor in the "sliding scale" analysis. Here the public harm is that of its being deprived of the operation of competitive forces if Sunrise's product were excluded from the market, as against the unsubstantiated claim that the public, when buying the Sunrise T-shirt, is somehow being saddled with an inferior knock-off while it purportedly believes that it is buying the "real thing" in the form of Fashion's product. That latter hypothesis demands too much in the way of speculation as contrasted with proved facts. This Court opts for permitting the public to make its own interrelated decisions on quality and price in the freedom of the marketplace—and the way to do that is to deny Fashion the monopoly that it seeks.

\* \* \*

In the environment of Fashion's Complaint and its initial supporting materials, it made eminently good sense for this Court to grant it a TRO pending the presentation of the facts in an evidentiary hearing. That has now been done, and it has turned out that the evidence points in the opposite direction. Fashion's motion for a preliminary injunction is therefore denied, and the TRO (though it was rightly issued on the basis of what was originally before this Court) is hereby dissolved.