**THREE BLIND MICE DESIGNS CO., INC., Plaintiff/Counterdefendant,**

v.

**CYRK, INC., Defendant/Counterplaintiff.**

Civ. A. No. 94–11710–PBS.

United States District Court, D. Massachusetts.

June 16, 1995.

Ralph A. Loren, Ann Lamport Hammitte, Lahive & Cockfield, Boston, MA, for Three Blind Mice Designs Co., Inc.

Edward R. Schwartz, Christie, Parker & Hale, Pasadena, CA, Roger M. Barzun, Law Office of Roger M. Barzun, Concord, MA, for Cyrk, Inc.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF ENTRY OF JUDGMENT

SARIS, District Judge.

### INTRODUCTION

Plaintiff Three Blind Mice Designs Co., Inc. ("TBM") and defendant Cyrk, Inc. ("Cyrk"), both produce t-shirts and other apparel imprinted with caricatures of sports referees in the form of three blind mice. Plaintiff files claims under the federal unfair competition statute, section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and state law. After a bench trial, this court concludes that defendant has violated section 43(a). Although TBM has failed to establish entitlement to damages, the Court orders Cyrk to refrain from selling any of its apparel with the "3 Blind Refs" design in Massachusetts.

### BACKGROUND

#### 1. *Three Blind Mice (TBM)*

Three Blind Mice Designs Company, Inc. (TBM) was incorporated in Massachusetts on September 25, 1992, by Paul Stewart. TBM's sole office is located at the situs of Robert Morahan's business, Hunter's Enterprises, in Woburn, Massachusetts. Stewart is the President and principal shareholder of TBM. Plaintiff uses the trade name Three Blind Mice.

Stewart is a National Hockey League ("NHL") Official, and has been so since 1985. He has been involved in professional hockey, originally as a player, for twenty years. So were his father and grandfather before him. The nursery rhyme, "Three Blind Mice" is commonly played at hockey games when the officials come onto the ice. This gave Stewart the idea of creating a tasteful, good-humored design showing three blind mice as hockey referees.

After the hockey season was over in 1991, Stewart sought out the services of an artist to design a three blind mice motif for sports officials, which he then had placed on shirts. Initially, in 1991 he gave shirts with this design away to people he worked with, and at charity events, like one for the Special Olympics. After displaying his shirt on a local television show in October, 1991, he filled orders for 30 shirts with the three blind mice logo. Stewart has used the "Three Blind Mice" *hockey* design on clothing, as a designation of source or origin, since August or September 1991. Plaintiff has sold apparel with the remaining designs (soccer, basketball, baseball, football) in interstate commerce on clothing, as a designation of source or origin, since October 1992. Stewart also

uses the three blind mice design and name on business cards, letterhead, stationery and mail order sheets.

The "Three Blind Mice" designs are fanciful representations of three gray mice wearing dark glasses and officials' shirts. See Appendix A. The designs are customized for soccer, hockey, basketball, football, and baseball by, *inter alia,* placing the equipment for the particular sport into the hands of one of the referee mice. The "Three Blind Mice" designs are displayed on t-shirts and sweatshirts in silk-screened form. The Three Blind Mice Designs are also embroidered on hats, the breast of golf shirts, the breast of sweaters, and the neck of turtleneck sweaters.

Stewart owns Massachusetts Trademark Registration No. 46738, dated April 21, 1992 for a design mark for use on clothing. Massachusetts Trademark Registration No. 46738 is for a design mark depicting three gray mice, dressed in black and white striped referee shirts, and wearing sunglasses. All the mice are on hockey skates. On the application dated April 14, 1992, Stewart stated that he first used the mark in Massachusetts in 1992.

Stewart has marketed TBM apparel in a variety of different ways. Beginning in July, 1992, Stewart appeared regularly on local and national television and on radio talk shows, in his capacity as a hockey referee, and displayed his clothing bearing the "Three Blind Mice" designs. TBM also obtains considerable publicity by donating clothing and a percentage of its revenues to charitable and fund-raising organizations, and has done so since its inception. For example, in 1993 and 1994, Stewart gave away shirts at the Salvation Army, at the Special Olympics, the Juvenile Diabetes Foundation, at the Channel 2 Auction, and at innumerable hockey, golf and school events. However, Stewart is a poor recordkeeper, and has not maintained records of how much money or clothing was actually contributed to charity.

More conventionally, plaintiff also advertises its goods in print in *Referee Magazine,* which goes to all sports officials in the United States, and in *Hockey/U.S.A.* In 1992, he sent out mail order catalogues to all NHL employees, and sold his shirts from 1992 in national "slap" shops which cater to hockey players. He has placed his hockey apparel in kiosks in most hockey arenas in North America. He also in 1993 sold shirts through the Central Hockey League in Tulsa, Oklahoma, and the International Hockey League. TBM's advertising and promotional expenses for 1993 were $6,068, and for 1994, $2,310.

The print advertisements often state that proceeds are given to charitable organizations, as do the hang tags or inserts attached to plaintiff's goods. However, TBM does not have a written contract with either Special Olympics or Massachusetts Juvenile Diabetes authorizing TBM's solicitations on their behalf; has never registered as a commercial co-venturer with the public charities division of the Massachusetts Attorney General's Office (the "Division"); has never filed a bond or a financial statement with the Division; has never guaranteed that a specific percentage of its sales proceeds would go to the designated charity; and has not kept complete financial records of its activities within the Commonwealth.

Plaintiff markets its clothing in commerce to the public directly, in retail stores in Massachusetts, like Holivak and Coughlin and five Crosby Athletic stores in New York. In November 1992, he hired three part-time sales representatives, who attempted to sell goods in New Jersey, New York, Philadelphia and Los Angeles. While TBM gave samples to many celebrities (like President Clinton, Wayne Gretzky and even Robert Shapiro) and to retail stores in different states and Canada, he never made any significant inroads into any non-hockey markets other than Massachusetts. Indeed, in both 1993 and 1994, TBM was "in the red." Its sales force has been cut down to one.

TBM has made the following applications to the U.S. Trademark Office [1]:

---

1. TBM obtained United States copyright registrations for all five of the Three Blind Mice designs by October, 1992, but plaintiff stipulated to noninfringement of those copyright registrations.

| Application Serial No. | Filing Date | Design |
|---|---|---|
| 74/532,253 | June 1, 1994 | Three Blind Mice Soccer Design |
| 74/532,300 | June 1, 1994 | Three Blind Mice Basketball Design |
| 74/532,325 | June 1, 1994 | Three Blind Mice Hockey Design |

These applications have been rejected by the PTO on the grounds that the designs are mere ornamentation. Although the three blind mice designs are not registered with the PTO, TBM nevertheless has improperly used the federal trademark registration symbol, an R within a circle, with the designs since their creation.

### 2. *Cyrk*

Cyrk, Inc., is a publicly traded corporation located in Gloucester, Massachusetts, which has been designing, manufacturing and distributing items of apparel, including t-shirts, since 1976. In addition to apparel sold under the Cyrk house mark, Cyrk private labels t-shirts for such prominent companies as Gillette, FAO Schwartz, Fidelity Investments, and Esprit. As a result of its nearly twenty years in the apparel business, Cyrk is well-known in the trade as a source of high quality athletic apparel.

Cyrk presently employs approximately 50 artists in-house. In July 1993, it employed approximately 40 artists. One of Cyrk's divisions is devoted to the design and sale of Cyrk-branded athletic apparel. Cyrk has made t-shirts which are addressed to the soccer market for six or seven years and is very well known in the soccer trade. In 1994, Cyrk added a basketball line of t-shirts.

Cyrk brand apparel is promoted at trade shows and by Cyrk sales representatives. Cyrk customers include athletic retail chain stores and soccer specialty stores. Cyrk has thousands of accounts, of which hundreds have purchased the accused t-shirts. Cyrk does not make hockey apparel and its products are not sold at hockey arenas.

Cyrk usually introduces two lines of t-shirts per year. These lines are shown in Cyrk catalogs which are distributed at trade shows and to Cyrk's prospective customers and customers. Cyrk-branded t-shirts have a label attached on the inside of the collar which identifies the Cyrk brand. In addition, a hangtag is attached to the t-shirts which clearly identifies Cyrk as the source of the t-shirt. Further, some t-shirts, such as the accused t-shirts, bear a copyright notice indicating Cyrk as the owner of the T-shirt's design.

Anton Nistl, Cyrk's director of sales-retail, played soccer for many years. His career culminated with his earning All-American honors at UCLA and playing for the United States National Team. Upon joining Cyrk in July 1993, Nistl suggested an idea for a t-shirt design which he had had since his youth. The idea, which was based on a parody of the nursery rhyme, "Three Blind Mice," was to have three blind mice as soccer referees. Peter Silva, one of Cyrk's top staff artists, was told the idea by Nistl but was not given any instructions as to the actual design. Silva promptly created a design based on Nistl's idea. See Appendix B. The design was accepted and used on a Cyrk-branded t-shirt. The design was accompanied on the front of the t-shirt by the words "3 Blind Refs." A slightly-modified version of the parody of the "Three Blind Mice" rhyme was printed on the back of the t-shirt. The initial work orders are dated July 3, 1994 and the art was approved on July 16, 1993.

Nistl oversees the choice of designs to be used by Cyrk. The criteria for designs is that they be youthful, animated, colorful, bold and have a fun approach. He chooses designs which he expects the public to like. Nistl accepted the design created by Silva even though the referees wore black and white striped shirts. Nistl thought "the design was pretty funny, pretty animated, and Cyrk is known for animated, fun, colorful designs." The t-shirt bearing the "3 Blind Refs" design was given the name "Drive Ya To Cleveland" (it is company practice to use silly inside jokes to name its design lines), and all references to the t-shirt in Cyrk catalogs and order forms refer to the t-shirt under that name. Cyrk has always promoted its Drive Ya To Cleveland T-shirts as a

Cyrk product and has never represented in any manner that the T-shirts were a product of plaintiff or that Cyrk or its products were in any way associated with, or sponsored or authorized by TBM. Cyrk had no intent to trade on TBM's goodwill.

Cyrk introduced the "Drive Ya To Cleveland" soccer t-shirt at the National Sporting Goods Association trade show in Chicago in August 1993. The t-shirt was displayed at the show and included in a Cyrk catalog which was distributed at the show. In January 1994, Silva designed a Drive Ya To Cleveland t-shirt in which the design had been modified from a soccer to a basketball motif. This t-shirt was first offered for sale at a trade show in February 1994. Customers order the accused t-shirts by the product number or by its name in the catalog, "Drive Ya To Cleveland."

Cyrk has many more sales representatives than TBM. Cyrk's gross sales of the accused t-shirts as of February 27, 1995 was $410,408.50. Costs related to the accused t-shirts are: cost of the goods sold, $202,-259.13; screens, $1,421.00; samples $429.00; commissions to sales representatives, $41,-040.86 and commission to the artist $3,550.05. Total costs were $248,700.04. Cyrk's net profits on the "Drive Ya To Cleveland" t-shirts was $161,708.55.

As of the date of creation and introduction of the "Drive Ya To Cleveland" t-shirts in July 1993 and January 1994, none of Cyrk's personnel involved with the Cyrk t-shirts, including Nistl, Silva, and Enge, were aware of the existence of TBM, its three blind mice designs, or t-shirts or other apparel bearing TBM's "Three Blind Mice" designs.

Cyrk presently has over 100 designs in the soccer field for T-shirts and over 100 for basketball. Cyrk has had over 250 soccer designs since 1993. Of these, 4 designs have been withdrawn as a result of complaints concerning parodies on the Cyrk shirts. Cyrk withdrew the shirts to avoid offending large potential customers such as American Express and Hershey and to avoid the costs of litigation.

### 3. *Encounter Between TBM and Cyrk*

Cyrk first became aware of TBM in March 1994 when a representative of TBM, Robert Morahan, requested Cyrk to improve and create new TBM designs. Morahan was told by Kevin Phoenix, ("Phoenix") a Cyrk customer support representative, that Cyrk would not open a new account for TBM unless a credit application was completed. Morahan left samples of TBM's "Three Blind Mice" soccer, football, hockey designs with Phoenix but did not return a completed credit application. Consequently, Cyrk did not open an account for TBM and no work was performed on the TBM designs. In March 1994, Phoenix worked in the private label division of Cyrk, and was located in a different building from Nistl and the Cyrk-branded apparel division. As of the meeting with Morahan in March 1994, Phoenix was unaware of Cyrk's "Drive Ya To Cleveland" t-shirts and did not subsequently speak to Nistl about TBM's designs. Phoenix had not previously heard of TBM or seen TBM's "Three Blind Mice" designs.

After that meeting, Stewart became aware that Cyrk, Inc. was selling t-shirts bearing a "3 Blind Refs" soccer design in April of 1994. Stewart then telephoned Anton Nistl at Cyrk, Inc. in April of 1994 and advised him of TBM's rights in the "3 Blind Refs" soccer design. Mr. Nistl said, on Cyrk's behalf, that Cyrk, Inc. intended to keep selling the "3 Blind Refs" shirts. In late 1994, Plaintiff learned that defendant was also selling clothing bearing a second "Three Blind Mice" design, for basketball.

### 4. *Confusion*

Members of the public have asked Stewart to autograph defendant's "3 Blind Refs" shirts, thinking they were his. Members of the public also have expressed confusion as to the source or origin of defendant's "3 Blind Refs" shirts. Also, sports officials and referees have told Stewart that they had his t-shirt when in fact they had Cyrk's. Other sports officials criticized Stewart for having a t-shirt that disparaged referees, although they really had Cyrk's shirt.

## DISCUSSION

### A. State Claims

Plaintiff alleges three theories under state law: statutory unfair competition pursuant to Mass.Gen.L. Ch. 93A (Count I); dilution pursuant to Mass.Gen.L. Ch. 110B (Count II); and trademark infringement (Count III).

### 1. State Statutory Unfair Competition

■ Count I alleges unfair competition under the Massachusetts Consumer Protection Act, Mass.Gen.L. ch. 93A, § 2. Plaintiffs do not nearly establish that defendants' conduct reached the necessary level of "rascality." *See, e.g., Compagnie de Reassurance v. New England Reinsurance Corp.*, 825 F.Supp. 370, 381 (D.Mass.1993). Defendants came up with the idea for their design independently, and prominently marked their shirts with their brand name in three separate places.

The only contact alleged between a representative of TBM and Cyrk occurred in March of 1994. There is plainly no basis for plaintiff's allegations of bad faith, because Cyrk's director of retail sales, Anton Nistl, came up with the idea for a "3 blind mice" soccer shirt in July 1993, and for a similar basketball shirt in January 1994, before he ever met TBM personnel. The idea was adapted from a parody of the nursery rhyme sung by Nistl and his friends as children. Nistl's testimony is corroborated by that of TBM employee Brian Enge, who was present at early brainstorming meetings.

### 2. State Anti-dilution Statute

■ Plaintiff also alleges that defendant violated the state anti-dilution law, Mass. Gen.L. ch. 110B, § 12. This is not a case where the anti-dilution statute serves a unique function in modern law. The overriding modern purpose of anti-dilution statutes is to "prohibit a merchant of *non-competitive* goods from selling its products by trading the goodwill and reputation of another's mark." *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 30 (1st Cir.) (emphasis added), *cert. denied*, 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987). "Anti-dilution statutes have developed to fill a void left by the failure of trademark infringement law to curb the unauthorized use of marks where there is no likelihood of confusion between the original use and the infringing use. The law of trademark dilution aims to protect the distinctive quality of a trademark from deterioration caused by its use on *dissimilar* products." *Id.* (emphasis added).

To the extent that the anti-dilution statute prohibits the marketing of a product resulting in a likelihood of confusion between *similar*, directly competitive goods, *id.*, it is wholly preempted in this case by section 43(a) of the Lanham Act. *Cf. Thrifty Rent–A–Car System, Inc. v. Thrift Cars, Inc.*, 639 F.Supp. 750, 754–55 (D.Mass.1986) (discussing federal preemption in the law of trademark and unfair competition) *aff'd*, 831 F.2d 1177 (1st Cir.1987).

### 3. State Trademark Infringement

■ Next, plaintiff alleges infringement of its state-registered trademark, in violation of Mass.Gen.L. ch. 110B, § 11. To make out a claim for trademark infringement, a plaintiff must "establish that the symbols in which the property right is asserted are valid, legally protectible trademarks; that they are owned by plaintiff; and that defendant's subsequent use of similar marks is likely to create confusion as to origin of the goods." *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 581–82 (2d Cir.1990).

Stewart obtained a Massachusetts trademark registration on his three blind mice design, for *hockey* only, on April 21, 1992. Plaintiff has established that Cyrk's use of similar trademarks is likely to cause confusion as to the origin of the goods. *See infra* at pp. 18 et seq.; *Planned Parenthood Fed'n, Inc. v. Problem Pregnancy of Worcester, Inc.*, 398 Mass. 480, 488, 498 N.E.2d 1044, 1046 (1986) (plaintiff showing likelihood of confusion is entitled to equitable relief).

Defendant makes two arguments to cast into doubt the legal effect of this registration. First, defendant argues that the mark was not used on all goods listed in the registration until September 1992, in violation of the law's requirement that the mark have been in actual use *prior* to the filing date. Mass. Gen.L. ch. 110B, § 2. Plaintiff sold products

bearing the three blind mice hockey design since the fall, 1991. Second, it argues that the owner of the trademark is Stewart, not TBM. Plaintiff asserted in its post-trial memorandum that Stewart duly assigned his designs and registrations to his company. However, the post-trial memorandum does not cite any evidence to support this claim, and the court cannot find any record support for such an assignment. Because there is evidence that Stewart, not TBM, is the owner of the trademark, judgment must enter for defendant on this Count. *But see* Fed. R.Civ.P. 15(b) (permitting amendments to conform to evidence even after judgment).

### B. *Federal Unfair Competition*

■ The gravamen of plaintiff's complaint is Count IV, alleging violation of the federal unfair competition statute. Section 43(a) of the Lanham Act forbids persons from using

> in connection with any goods ... or any container for goods, ... any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to origin, sponsorship, or approval of his or her goods ... by another person.

15 U.S.C. § 1125(a). To make out a claim under § 43(a), a plaintiff need not show that its mark is registered, but must establish that its mark is (1) either inherently distinctive or has acquired secondary meaning; (2) is not merely functional; and (3) is likely to be confused with defendant's mark. *See, e.g., Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. ——, ——, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992). Each showing is discussed in turn.

### 1. *Inherent Distinctiveness or Secondary Meaning*

■ Marks may generally be classified into four categories, in ascending order of protectibility: (a) generic; (b) descriptive; (c) suggestive; and (d) arbitrary or fanciful. *See, e.g., Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2757. Marks falling into either of the latter two categories are considered "inherently distinctive." *Id.* "Whether a term is generic, descriptive, or inherently distinctive is a question of fact." *Boston Beer Company v. Slesar Bros. Brewing Co.,* 9 F.3d 175, 181 (1st Cir.1993). Plaintiff argues that its mark is arbitrary or fanciful, and thus so inherently distinctive that it need not meet the "vigorous evidentiary requirements," *id.,* entailed in proving that its mark had acquired secondary meaning in the public mind by the time the junior user's mark came to market. "Secondary meaning 'refers to a word's, or a sign's, ability to tell the public that the word or sign serves a special trademark function, namely, that it denotes a product or service that comes from a particular source.'" *Id.* (citation omitted).

■ In support of its argument, plaintiff relies on the precedent of *Black Dog Tavern Co., Inc. v. Hall,* 823 F.Supp. 48 (D.Mass. 1993). In *Black Dog,* Chief Judge Tauro found that the mark of a black dog, imprinted on t-shirts sold successfully for many years by a Martha's Vineyard restaurant, was properly classified as "arbitrary or fanciful," and therefore "inherently distinctive," because it bore "'no logical or suggestive relation to the actual characteristics of the goods or services'" offered by the owner of the mark. *Id.* at 53 (citations omitted); *see also Foxworthy v. Custom Tees, Inc.,* 879 F.Supp. 1200, 1212 (N.D.Ga.1995) ("You might be a redneck ..." t-shirt found to be only "suggestive" of comedian's brand of humor, and thus "inherently distinctive"). *Cf. WCVB–TV v. Boston Athletic Ass'n,* 926 F.2d 42, 46 (1st Cir.1991) (Breyer, J.) ("Pure cotton" t-shirt offered as hypothetical example of a highly "descriptive," likely unprotectible mark); *Maryland Stadium Authority v. Becker,* 806 F.Supp. 1236, 1239 (D.Md.1992) ("Camden Yards" t-shirt found to be geographically "descriptive," and therefore protectible only if it had acquired secondary meaning), *aff'd,* 36 F.3d 1093 (4th Cir.1994) (Table); *Tailor Tee, Inc. v. Stedman Mfg. Co.,* 286 F.2d 612, 613 (USCCPA 1961) ("Tailored T" and "Tailor–Tee" t-shirts described by opposing parties as "descriptive" marks). *But see Jungle Rags, Inc. v. Rainbow Graphics, Inc.,* 29 U.S.P.Q.2d 1704, 1993 WL 720672 (M.D.Fla.1993) (holding that to classify children's shirts with flap in the shape of an animal's mouth as inherently distinctive would place a monopoly on the fashion idea

itself); *Fashion Victim Ltd. v. Sunrise Turquoise*, 785 F.Supp. 1302, 1308 (N.D.Ill.1992) (holding that to classify t-shirts with designs of skeletons in assorted sexual positions as inherently distinctive would place a monopoly on the fashion idea itself).

Defendant argues that TBM is not entitled to trademark protection because there was a stipulation of non-infringement of TBM's copyright. While the "substantial similarity" analysis required for determining a claim of copyright infringement is similar to the trademark analysis required under the Lanham Act, it is not identical. *See, e.g., Fashion Victim, Ltd. v. Sunrise Turquoise, Inc.*, 785 F.Supp. at 1308. Relying on *Fashion Victim*, defendant argues that plaintiff's use of the three blind mice design for sports officials cannot be held "inherently distinctive" without "giving that term the unacceptable meaning of granting a monopoly in the theme—the idea—itself." *Id.* However, the Lanham Act provides that arbitrary or fanciful marks are entitled to protection where their "intrinsic nature serves to identify a particular source of a product." *Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2757.

In this case, because the "three blind mice" design, like the "black dog" design, bears no discernible relationship to the apparel on which it is imprinted, plaintiff's marks are inherently distinctive. Defendant's secondary meaning arguments need not be addressed.

### 2. *Non-functionality*

■ Defendant argues that the designs are mere ornamentation because they are emblazoned across the front of a shirt or sweatshirt. However, many of the designs are placed on the breasts of shirts, the necks of turtle neck shirts, or on hats in a way which has been used by other companies to designate the source of the goods, *e.g.,* an alligator for Izod, or a polo pony for Ralph Lauren. Despite its decorative function, the imprint of plaintiff's trademark on t-shirts, sweatshirts, hats and golf shirts is widely understood as a designation of source or origin and therefore constitutes protectible trademark usage. *See Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 33 (1st Cir.1989);

*Black Dog*, 823 F.Supp. at 53 ("Where ... a mark indicates source, its 'aesthetic functionality' cannot preclude a finding of nonfunctionality."); *In re Watkins Glen Internat'l, Inc.*, 227 U.S.P.Q. (BNA) 727, 728 (TTAB 1985) ("It is well settled ... that matter which serves as part of the aesthetic ornamentation of goods ... may nevertheless be registered as a trademark for such goods if it also serves a source-indicating function.") (citing cases).

### 3. *Likelihood of Confusion*

■ The likelihood of consumer confusion is generally the key element of a claim for federal unfair competition. *See, e.g., Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 492–93 (1st Cir. 1981). Likelihood of confusion is conventionally gauged according to eight factors: (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendants' intent in adopting the mark; and (8) the strength of the mark. *See, e.g., Volkswagenwerk AG v. Wheeler*, 814 F.2d 812, 817 (1st Cir.1987). After applying the 8–factor confusion test to the facts adduced at trial, this court concludes that plaintiff has established a right to equitable relief in Massachusetts.

### a. *Similarity*

Both plaintiff and defendant produce white and ash colored t-shirts, with three blind mice in shades of gray, wearing black-and-white striped shirts and black sunglasses.

Defendant points to a number of dissimilarities. Cyrk's design is accompanied by the words, "3 Blind Refs." Its mice have a different, funkier "look"—they wear gray shorts, are barefoot, and hold various sports paraphernalia in their hands. Finally, the shirts have a different "tone." Defendant characterizes its shirts' tone as "humorous." Plaintiff characterizes defendant's tone as "straggled" and "demeaning," as opposed to "sleek," "professional," "cute," and "nifty."

Despite the dissimilarities between the designs, this court concludes that the similarity in overall conception is so strong as to make confusion inevitable. The consumers of an inexpensive t-shirt or sweatshirt, in taking a shirt off a rack or shelf, don't scrutinize labels, and would fairly assume that the goods were from the same source but with a different tone. The relevant standard is the "total effect" of the mark, considering sight, sound, and meaning. *See, e.g., Volkswagenwerk*, 814 F.2d at 817; *Calamari Fisheries, Inc. v. The Village Catch, Inc.*, 698 F.Supp. 994, 1009 (D.Mass. 1988).

### b. *Trade Channels/Advertising/Marketing*

The overlap between the parties' trade channels, advertisers, and markets are three factors conventionally analyzed together. *See, e.g., Volkswagenwerk*, 814 F.2d at 818.

There is no evidence that the parties advertise in the same publications. There is also no evidence that plaintiff has effectively marketed itself in a national market except in the hockey area. However, there is a strong overlap within Massachusetts. Both plaintiff and defendant sell to sports-related clothing retailers and wholesalers in Massachusetts. They also market their merchandise at similar trade shows in Massachusetts like the magic show and super show, and at the World Soccer Cup.

The class of customers overlaps. It is true that each party focuses heavily on different subcultures within the universe of sports— plaintiff on hockey culture and defendant on soccer culture. But, ultimately, sports fans comprise the target audience of each party. The demographic sector targeted is identical, as plaintiff's and defendant's leading goods (t-shirts) retail, respectively, for fifteen and sixteen dollars apiece. These t-shirts are inexpensive, and there is no evidence that they are purchased only after careful consideration. *See Pignons*, 657 F.2d at 489 ("Courts have found less likelihood of confusion where goods are expensive and purchased after careful consideration"). Accordingly, there is an overlap in trade channels, but it is limited to Massachusetts.

### c. *Actual Confusion*

Actual confusion is often taken to be the most persuasive possible evidence that there is a likelihood of confusion. *See, e.g., Calamari*, 698 F.Supp. at 1011. Even a minimal demonstration of actual confusion may be significant. *See Edison Bros. Stores, Inc. v. National Dev't Group, Inc.*, 1992 WL 55465 at *3 (D.Mass. Mar. 6, 1992) (Zobel, J.).

Stewart received complaints from several of his friends in referee circles, who were upset about the demeaning tone of what they assumed to be his new designs. Stewart has also been asked to autograph defendant's goods on several occasions, including once by a group of children on a golf course. Stewart has presented six examples of actual confusion. Although the record is unclear as to the geographic location of all the hockey referees who expressed confusion as to origin, the consumer confusion was concentrated in Massachusetts.

### d. *Defendant's Intent*

Intentional copying gives rise to a strong presumption that confusion was likely. *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 12 U.S.P.Q.2d 1001, 1011–12, 1989 WL 282850 (S.D.N.Y.1989). In this case, however, as discussed *supra* Part A.1 under the heading of Mass.Gen.L. ch. 93A, this court has found no proof whatsoever of bad faith or copying on the part of defendant.

### e. *Strength of the Mark*

The strength of a mark is ordinarily measured by such factors as: the length of time a mark has been used; the plaintiff's relative renown in its field; the plaintiff's vigilance in promoting its mark; the number of similarly registered marks in the field; and the success of other firms in registering similar marks. *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 33 (1st Cir.1989).

Stewart obtained Massachusetts trademark registration for its hockey design on April 21, 1992. U.S. trademark applications were also filed for several marks on June 1, 1994; the applications were rejected.

Plaintiff has marketed its distinctive hockey apparel since 1991, and its corresponding

apparel for the other 4 major team sports since late 1992. These are the company's primary products. It has recorded total revenues on the order of $50,000 per annum, with sales concentrated in the Massachusetts area. (Finer breakdowns of the sales figures, by style or design or region, are not available.) Although paid advertising has been minimal (for instance, $6,068 for 1993), the evidence shows that Stewart wears the t-shirts and promotes them constantly on television interviews (mainly during hockey broadcasts), at charity events, and at speaking engagements, primarily in Massachusetts.

This court concludes that the strength of plaintiff's marks is at best moderate. It further notes, significantly, that the extent of sales and promotion of each mark is not identical. "The actual geographical area a party carves out is a question of fact, and a court delimits the area by examining the party's reputation, advertising, and sales with respect to the territory in question." *Thrifty*, 639 F.Supp. at 753. This court finds that only for its hockey mark has plaintiff carved out a national (as opposed to a statewide) field of play.

### f. *Conclusion*

This court concludes that plaintiff has succeeded in demonstrating a likelihood of confusion between its marks and defendant's only in Massachusetts. In reaching this conclusion, this court pays special attention to the similarity of the marks, their overlapping trade channels/markets, and the evidence of actual confusion. Because plaintiff also succeeded in demonstrating that its mark is inherently distinctive and non-functional, it has made out a redressable claim under section 43(a) of the Lanham Act.

### C. *Relief*

#### 1. *The Unclean Hands Doctrine*

"The maxim that 'he who comes into equity must come with clean hands' of necessity gives wide range to a court's use of discretion." *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 912 (1st Cir.1989) (citation omitted) (overruling "unclean hands" defense without comment was not abuse of discretion by trial court).

■■■ Defendant makes much of two infractions by the plaintiff: improperly using the trademark registration symbol before obtaining registration, and neglecting to register as a commercial co-venturer with charitable organizations pursuant to Mass.Gen.L. ch. 68, §§ 18–35. Defendant cites *Fox–Stanley Photo Products, Inc. v. Otaguro*, 339 F.Supp. 1293, 1295 (D.Mass.1972), for the proposition that illegal use of the trademark registration symbol is so serious a violation of the clean hands doctrine as to bar injunctive relief. However, as in all applications of the clean hands doctrine, the essential question is plaintiff's intent. *Cf. Copelands' Enterprises, Inc. v. CNV, Inc.*, 945 F.2d 1563, 1567 (Fed.Cir.1991) ("improper use of a registration notice in connection with an unregistered mark, *if done with intent to deceive* the purchasing public or others in the trade into believing that the mark is registered, is a ground for denying the registration of an otherwise registrable mark.") (emphasis added).

Here, the Court finds no bad faith, either in plaintiff's use of the registration symbol, or in its failure to register as a charitable co-venturer. Stewart is a spontaneous, warmhearted person who literally gave the t-shirts off his rack at innumerable charitable events. While he should pay as much attention to the details of running a business—like accounting, regulations governing charities, trademark law and the like—as he does to the details of refereeing a game, his transgressions did not arise out of any intent to deceive. There is therefore no bar to injunctive relief.

#### 2. *Injunctive Relief*

■■■ A district court has broad discretion to fashion an injunction to suit the circumstances in the particular case. *See, e.g., Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it."). The Supreme Court has repeatedly made clear that this is generally true even when the injunctive rem-

edy is congressional in origin. *See Williams v. Jones*, 11 F.3d 247, 256 (1st Cir.1993) (citing cases).

■ This court has determined that plaintiff's "three blind mice" design has been seriously promoted on a national scale only within the confines of the hockey world. Defendant, however, does not manufacture a hockey t-shirt or apparel, and there is no evidence it intends to do so. Plaintiff seeks a nationwide injunction against Cyrk's use of the "3 Blind Ref" motif. However, plaintiff has not established that it has significantly promoted its marks in any market other than in Massachusetts. Therefore, defendant is enjoined, only within the Commonwealth of Massachusetts, from marketing and selling infringing apparel.

### 3. *Damages*

■ The First Circuit's cases under the Lanham Act "have drawn a clear distinction between the showing required to establish a right to injunctive relief and that required to establish a right to damages.... [A] showing that the defendant's activities are likely to cause confusion or to deceive customers suffices to warrant injunctive relief, but ... a plaintiff must show actual harm to its business, a diversion of sales, for example, in order to recover damages. This rule has been followed by several other circuits." *Camel Hair and Cashmere Institute of America, Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir.1986) (citations omitted); *accord Aktiebolaget Electrolux v. Armatron Internat'l, Inc.*, 999 F.2d 1, 5 (1st Cir.1993) (a plaintiff seeking damages must prove actual harm, such as the diversion of sales to the defendant, and a plaintiff seeking an accounting of defendant's profits must show that the products directly compete such that the profits would have gone to plaintiff if there was no violation).

■ In this case, particularly in light of its lax accounting practices, plaintiff has manifestly failed to show actual harm, by a diversion of sales or otherwise. Cyrk is a publicly traded company, with a sales force of over forty. TBM is a shoestring operation, with at most 3 sales representatives. Cyrk has long-term relationships with many hundreds of stores nationally, including 800 soccer specialty stores. TBM has no equivalent customer base. For its "Drive ya to Cleveland" line, Cyrk reported profits of $161,708.55 on gross sales of $410,408.50, from its beginning at the end of 1993 until February 27, 1995. *TBM has never turned a profit.* For the last full year before Cyrk's entry into the field, the year ending June 1993, TBM recorded revenues of $59,471.52. For the following year, TBM logged revenues of $50,832.48. The small decline in TBM's business might be accounted for by the 1994 lock-out in professional hockey, which reduced the schedule from 84 to 48 games. On this record, it cannot be concluded that Cyrk's entry into the field diverted any profits from TBM, or otherwise caused any measurable actual damage. As there was no willful or deliberate infringement, an accounting for defendant's profits is not equitable pursuant to 15 U.S.C. § 1117(a). *Valmor Products Co. v. Standard Products Corp.*, 464 F.2d 200 (1st Cir.1972) (plaintiff entitled to profits attributable to infringement only if the infringement was willful).

### D. *Counterclaims*

Defendant has filed two counterclaims. In the first counterclaim, it has sought a declaratory judgment of copyright invalidity and non-infringement; and in the second cancellation of plaintiff's state trademark registration. Defendant resolved its copyright claim because plaintiff stipulated to non-infringement. With respect to the second counterclaim, the request for declaration of trademark invalidity is denied on the grounds that, even assuming Stewart is the owner of the trademark, defendant has failed to prove its claim that the registration is invalid because the design is not used as a trademark. (¶ 49 of Answer and Counterclaim).

### ORDER

The Court orders entry of judgment for plaintiff on the claim of violations of the federal unfair competition statute, 15 U.S.C. § 1125(a) (Count IV). The Court orders entry of judgment for defendant on the remaining counts. For the foregoing reasons, this

Court **ALLOWS** plaintiff's motion for an injunction, and enjoins defendant, its officers, agents, employees, attorneys, successors, assigns, members and all persons in active concert or participation with it, from promoting, selling, offering for sale, distributing or advertising, sports apparel in Massachusetts using the three blind mice design, or the "3 blind refs" name together with the three blind mice design, on t-shirts or other sports apparel, or any other colorable variance on that trademark within 30 days of the date of this order. No damages are awarded.

The Court orders entry of judgment for plaintiff on the second counterclaim. The first counterclaim is dismissed pursuant to stipulation of the parties.