**MAPLE GROVE FARMS OF VERMONT, INC.,**

v.

**EURO–CAN PRODUCTS, INC., et al.**

**Civ.A. No. 94–30137–MAP.**

United States District Court,
D. Massachusetts.

July 30, 1997.

Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart v. Ford Motor Co.,* 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn,* 474 U.S. 140, 154–55, 106 S.Ct. 466, 474–75, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

Richard L. Binder, Jack R. Pirozzolo, Willcox, Pirozzolo & McCarthy, Boston, MA, for Plaintiff.

Edward T. Robinson, Seegel & Lipshutz, Wellsley, MA, Michael B. Cosentino, Seegel, Robinson & Lipshutz, Wellesley, MA, for Defendants.

*MEMORANDUM AND ORDER RE-GARDING REPORT AND RECOMMENDATION OF APRIL 25, 1997*

PONSOR, District Judge.

This court has now had an opportunity to review in detail the Report and Recommendation of Magistrate Judge Kenneth P. Neiman of April 25, 1997, regarding the defendants' Motion for Summary Judgment (Docket No. 51). In conducting this review the court has considered the parties' objections, applying a *de novo* standard.

Magistrate Judge Neiman's careful analysis makes an extended discussion unnecessary. Finding his conclusions to be correct, the court hereby adopts his Report and Recommendation. The defendants' Motion for Summary Judgment as to Counts I and II is hereby ALLOWED as to any claim for injunctive relief and as to any claim for damages arising from defendants' use of what the Report and Recommendation denominated "Jug 4." The motion is otherwise DENIED.

The clerk is ordered to set the case for a status conference to assign a trial date or discuss further pretrial proceedings.

It is So Ordered.

*REPORT AND RECOMMENDATION RE-GARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 51)*

April 25, 1997

NEIMAN, United States Magistrate Judge.

### I. INTRODUCTION

This is an unfair competition case brought by one of the largest sellers of pure maple syrup, Maple Grove Farms of Vermont, Inc. ("Maple Grove" or "Plaintiff"), against a more recent entrant into the market, Spring Tree Corporation ("Spring Tree") and its distributor, Euro–Can Products, Inc. (collectively "Defendants"). Maple Grove's complaint, which seeks both damages and a permanent injunction, raises claims under the federal unfair competition statute—section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)—and state law. At issue is the trade dress of various jugs of pure maple syrup.

"Trade dress" is a commonly used term in the law of unfair competition. *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.*, 781 F.2d 604, 608 (7th Cir.1986). It refers to the

entire visual image of a product and the overall effect it creates. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n. 1, 112 S.Ct. 2753, 2755 n. 1, 120 L.Ed.2d 615 (1992). A product's trade dress "is a complex composite of features" to be considered together, *American Greetings Corp. v. Dan–Dee Imports, Inc.*, 807 F.2d 1136, 1141 (3d Cir.1986), including the product's size, shape, color and graphics. *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 582 (2d Cir.1993).

Following the resolution of a number of preliminary disputes, District Judge Michael A. Ponsor, on April 30, 1996, referred the case to Senior District Judge Walter J. Skinner for mediation. When the case did not settle, Defendants filed the instant motion for summary judgment (Docket No. 51) which has been referred to this Court for a report and recommendation. See 28 U.S.C. § 636(b)(1)(B). After reviewing the parties' briefs and hearing oral argument, the Court recommends that the motion be allowed, in part, and denied, in part.[1]

### II. BACKGROUND

The following background is taken primarily from the statement of facts supplied by Plaintiff, the party opposing summary judgment. (Docket No. 60; *see also* Docket No. 52 (Defs.' Facts).) *See Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 534 (1st Cir.1996) (at summary judgment, the facts, and all reasonable inferences that may be drawn from them, must be viewed in the light most favorable to the non-moving party). Legal arguments made in the parties' factual statements are incorporated in Section IV, *infra.*

Maple Grove was founded in St. Johnsbury, Vermont in 1915 and has sold pure maple syrup to grocery chains, specialty stores and warehouse clubs for a number of years. It also has an extensive mail-order business. From 1986 until recently, one of

---

1. Also referred to this Court was Defendants' motion to strike, on hearsay grounds, a single paragraph of an affidavit supplied by Plaintiff in opposition to summary judgment. (Docket No. 71.) At oral argument, Plaintiff's counsel acknowledged the deficiencies of the paragraph and, accordingly, the Court orally allowed Defen-

dants' motion to strike. In a similar vein, Plaintiff's memorandum of law claims inconsistencies between several of Defendants' affidavits and the affiants' testimony at deposition. (Pl.'s Br. (Docket No. 59) at 41–42.) Plaintiff, however, has made no motion to strike and the Court does not do so *sua sponte.*

Maple Grove's customers was Waban, Inc., d/b/a B.J.'s Wholesale Club ("BJ's"), a New England-based warehouse store. By the spring of 1994, Maple Grove was the primary supplier of pure maple syrup to BJ's, at that time having sold about 700,000 jugs of its product to the chain. However, as discussed *infra*, Maple Grove's favored relationship with BJ's soured in the spring of 1994 when BJ's began buying pure maple syrup from Defendants.

In the early 1980s, Maple Grove began selling some of its syrup, including its sales to BJ's, in decorative one quart plastic jugs. The jugs themselves were supplied by Hillside Plastics, Inc. ("Hillside")—one of the nation's largest producers of maple syrup jugs—which has a trademark on the jugs' shape. Maple Grove printed a bright green and red design on almond-colored Hillside jugs.[2] As so designed, the jug (Jug 1), with some minor modifications (Jug 1A), was utilized by Maple Grove continuously until the spring of 1994 when it switched to Jug 2.[3]

*Jug 1:* The design on Jug 1 is best described as follows. At the center of the design is a vertically-oriented oval which contains, among other things, a farmhouse-barn-silo image and the words "maple grove farms" written in red. A similar oval is on the back of the jug. The sides of the jug display a woodland scene which includes the following elements: a snow covered red building; red sap buckets hanging on green maple trees; a wood pile; an ox; and men in red jackets laden with sap buckets striding through the snowy woods. A border of thirteen red maple leaves circles the bottom of the jug. The entire design is in red and

green and the jug is capped by a red plastic lid.

*Jug 1A:* Jug 1A is nearly identical to Jug 1. The main differences include the addition of nutritional and other information and a slightly more prominent farmhouse-barn-silo image. The woodland scene, although slightly more obscured by the added wording, remains essentially the same as on Jug 1.

*Jug 2:* Around the time that Maple Grove lost the BJ's account, in May of 1994, and in response to new federal labelling regulations, Maple Grove switched to a new design for its one quart jugs, Jug 2. The design of Jug 2 eliminates both the woodland scene on the sides of the oval and the bottom border of red maple leaves, adds several falling red maple leaves and gives more prominence to a larger farmhouse-barn-silo image. Moreover, the green is brighter than the greens used on Jugs 1 and 1A.

Although Jug 2 is Maple Grove's current design, Jug 1 continues to be displayed in Maple Grove's mail order catalogues as it has for approximately the last ten years.[4] Moreover, when BJ's told Maple Grove that it preferred Jug 1 to Jug 2, Maple Grove stated that, if BJ's resumed purchasing with Maple Grove, Jug 1 would be available to BJ's with the new FDA required label.

For a number of years, Defendant Spring Tree had continuously, and until recently unsuccessfully, tried to obtain BJ's business. In 1992, Spring Tree allied itself with a Canadian syrup broker, Jacques Letourneau ("Letourneau"), in a renewed attempt to sell its product to BJ's. Letourneau, evidently on his own, initially sold syrup to BJ's on a test basis in a "Maple Crest" jug.[5] BJ's tested

---

2. Hillside's jugs come in only two colors, almond and Bennington Gray. Almond is the more popular color and was the color chosen by Maple Grove.

3. Thirteen jugs were supplied as exhibits to Defendants' motion. The Court hereinafter refers to the jugs by the "MSJ" numbers attached by Defendants.

4. Maple Grove's catalogues have been distributed to around two million consumers in the United States. Approximately 300,000 copies of the catalogue are distributed in Massachusetts, New Hampshire, Connecticut, Rhode Island, New

York and Florida—states in which BJ's outlets are located.

5. The only Maple Crest jug supplied to the Court (Jug 6) is a two liter Canadian container. Its design contains a rectangle bearing the "Maple Crest" name. The rectangle is surrounded by a woodland scene containing the following elements: a building with a red roof; a man in a red hat pouring sap from a red bucket into a vat; another man in a red hat squatting near an open fire; red sap buckets attached to a number of green trees; and a smiling, animated tree with branch-like arms holding a red sap bucket.

this jug in eight to fifteen stores and found that the change in label did not affect sales. Apparently pleased with the results, BJ's asked Spring Tree for a controlled label, i.e., one that no other Spring Tree customers would have.

In the fall of 1993, Letourneau and Paul Simons ("Simons"), Spring Tree's president, met with BJ's buyer, Lawrence Cocuzzo ("Cocuzzo"). Simons offered Cocuzzo a lower price for pure maple syrup than any price Maple Grove was willing to offer. Although Cocuzzo agreed to Spring Tree's price, the deal was not immediately sealed. Specifically, Cocuzzo indicated his dissatisfaction with the artwork on at least four Spring Tree jugs that Simons presented, Jugs 9–12.[6] Cocuzzo indicated, however, that he liked a Maple Crest design Letourneau had brought with him from Canada. Spring Tree thereafter designed and shipped its product to BJ's in Jug 3 and has since been the primary supplier of pure maple syrup to BJ's. Maple Grove, on the other hand, now makes only occasional and irregular shipments to BJ's.

*Jug 3:* Like Maple Grove's Jugs 1, 1A and 2, Spring Tree's Jug 3 is a one quart, almond-colored Hillside jug with a red plastic lid. The design on Jug 3 contains a horizontally-oriented oval in which there are three red maple leaves and the name "Red Leaf Farms" printed in green. On either side of the oval is a woodland scene which contains the following elements: a red building with a snow covered roof; a woodpile; several dark green trees on which red sap buckets are attached; and a man wearing a red shirt carrying red sap buckets from the trees. The entire design is in bright red and green and the back of the jug indicates that it is distributed by "Euro–Can Products, Inc." Maple Grove claims that, at the time Jug 3

was introduced, the names "Red Leaf Farms" and "Euro–Can Products, Inc." were virtually unknown in the industry.

Letourneau has been in maple syrup business for many years. He claims to have "conceptualized" Jug 3 from a Maple Crest jug (Jug 6) that he had designed a number of years previously. (*See* n. 5, *supra.*) The actual artist of Jug 3 was Stephen Grant ("Grant"). Letourneau had directed Grant to include in his design "trees," "sap buckets on trees" and "a house and a small man who's carrying some maple in his hand."[7] Prior to the introduction of Jug 3, Letourneau had visited Maple Grove's headquarters in Vermont where Jug 1 was conspicuously displayed. In addition, Simons had direct knowledge of Jug 1's existence.

*Jug 4:* In July or August of 1994, suit having been filed, Spring Tree, "as a gesture of good faith," began selling pure maple syrup to BJ's in Jug 4. Jug 4 is a half gallon, almond-colored Hillside jug. Like Jug 3, Jug 4 contains a horizontally-oriented oval; however, unlike Jug 3, the ends of the oval on Jug 4 have been squared off and the oval contains only two red maple leaves. The words "Red Leaf Farms" (now a registered trademark) continue to be displayed over the oval while the following elements are depicted in the jug's woodland scene: a long red fence, interrupted in the middle by a road; a number of dark green trees with red sap buckets; and an open hilly background. There are no men, buildings or a woodpile. The entire design is in bright red and dark green.

*Jug 5:* In approximately January of 1995, when BJ's original order of Jug 3 ran out, Spring Tree, "again in a gesture of good faith," shipped its product to BJ's in Jug 5.

---

**6.** Jug 9 is designed in both red and black. At the center of the design is a triangle containing a red maple leaf and the name "Spring Tree" while on either side of the triangle are a number of large red maple leaves. Jug 10 is embossed in both blue and yellow. Several large maple leaves are displayed as are the words "Northern Nectar." Jug 11 is designed in blue and yellow and displays the "Spring Tree" name. Its background is of wood paneling and there are no maple leaves. Jug 12 is designed in both brown and light blue. It also displays the "Spring Tree"

name which is bordered on each side by a large tree with sap buckets.

**7.** During discovery, another jug designed by Grant was uncovered. (Defs.' Ex. 18.) The design on this vessel, a "Rykoff–Sexton" jug, consists of the following elements: the words "Old Devonshire"; three maple leaves; a snow covered building; sap buckets hanging on trees; a wood pile; a horse; two men carrying a sap bucket; and another man pouring sap into a bucket.

Jug 5 is an almond-colored Hillside jug with a red plastic lid. Although the words "Red Leaf Farms" remain, there is no oval. Instead, the scene consists of the following: a covered bridge; a building with a chimney blowing smoke; a man and a dog walking toward the building; another man pouring a sap bucket into a horse-drawn cart; a single tree with two sap buckets attached; and a second building with several trees in the background. Other than some wording, which is in red, the entire design of Jug 5 is in bright green.

## III. STANDARD OF REVIEW

In accordance with Fed.R.Civ.P. 56(c), summary judgment will be granted only if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." See National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.), cert. denied, 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995). Once the moving party has demonstrated that no genuine issue of material fact exists, the burden is on the opposing party to contradict the demonstration "by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." Id.

A "genuine" issue is one " 'that a reasonable jury could resolve ... in favor of the nonmoving party.' " McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1 st Cir.1995) (quoting United States v. One Parcel of Real Property (Great Harbor Neck, New Shoreham, R.I.), 960 F.2d 200, 204 (1st Cir.1992)). Not every genuine factual conflict, however, necessitates a trial. " 'It is only when a

disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared." ' Parrilla–Burgos v. Hernandez–Rivera, 108 F.3d 445, 1997 WL 114511, at *3 (1st Cir. Mar.19, 1997) (quoting Martinez v. Colon, 54 F.3d 980, 984 (1st Cir.), cert. denied, — U.S. —, 116 S.Ct. 515, 133 L.Ed.2d 423 (1995)).

## IV. DISCUSSION

Count I of Maple Grove's three-count complaint alleges a violation of section 46(a), the unfair competition provision of the Lanham Act, 15 U.S.C. § 1125(a).[8] Count II also asserts unfair competition, but without reference to any statutory provision. Count III alleges a violation of M.G.L. ch. 93A. All three counts are addressed, although Counts I and II are discussed together. First, however, the Court considers the injunctive relief Plaintiff seeks.

### A. Injunctive Relief

In addition to damages, discussed below, Plaintiff seeks to permanently enjoin Defendants from using any of the challenged jugs. Although the injunctive relief sought in the complaint is quite broad, it is evident to the Court that, practically speaking, Plaintiff is concerned only with Defendants' Jugs 3 and 4. Moreover, as Plaintiff's counsel confirmed at oral argument, Jug 5 is not being challenged.

In the Court's view, an injunction is unnecessary given the facts of this case. Jugs 3 and 4 have not been used in two years. In addition, Defendants aver that they have no

---

8. Count I has been variously characterized as a trade dress "infringement" claim. (See, e.g., Defs.' Br. (Docket 55) at 3; Pl.'s Br. at 14.) While federal infringement and unfair competition claims share many factors and are often interrelated, they derive from different portions of the Lanham Act. See Aktiebolaget Electrolux v. Armatron Intern., Inc., 999 F.2d 1, 2 n. 1 (1st Cir.1993) (noting that section 43(a) is the "unfair competition" provision while section 32(1), 15 U.S.C. § 1114, is the "infringement" provision); Black Dog Tavern Co. v. Hall, 823 F.Supp. 48, 53–59 (D.Mass.1993) (analyzing section 32(1) infringement claim separately from section 43(a) unfair competition claim). The main difference is that the infringement provision of the statute (section 32(1)) protects registered symbols while

the unfair competition provision (section 43(a)) protects unregistered symbols. Herman A. Isidro, The Abercrombie Classifications and Determining the Inherent Distinctiveness of Product Configuration Trade Dress, 62 Brook. L.Rev. 811, 812 (1996). Unfortunately, litigants have not always made the distinction crystal clear to the courts. See, e.g., Two Pesos, 505 U.S. at 765, 112 S.Ct. at 2755–56 (noting that plaintiff's "infringement" case was brought under section 43(a)); TEC Engineering Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 544 (1 st Cir.1996) (same). Because Plaintiff's trade dress was not registered, Plaintiff has appropriately brought Count I under section 43(a), and this Court hereinafter refers to it as an unfair competition claim.

intention of using Jugs 3 or 4 in the future. The Court therefore deems Plaintiff's bid for injunctive relief moot and considers the summary judgment issues only insofar as they relate to Plaintiff's claim for damages. As a result, the Court will recommend that, insofar as the complaint seeks an injunction, Defendants' motion for summary judgment be allowed.

## B.  Unfair Competition (Counts I and II )

■ The crux of the complaint is Counts I and II, wherein Plaintiff alleges unfair competition, specifically, a violation of section 43(a) of the Lanham Act.[9] Although there has been a good deal of wrangling as to the proper standard to be applied to section 43(a) cases, (see, e.g., Pl.'s Br. at 25 et seq.), the standard is, in this Court's view, relatively straightforward. To make out a claim under section 43(a), a plaintiff need not show that its trade dress is registered, but must establish, inter alia, that its trade dress is either inherently distinctive or has acquired distinctiveness through secondary meaning, and is likely to be confused with the defendant's trade dress. Two Pesos, 505 U.S. at 769–70, 112 S.Ct. at 2757–58.[10]

### 1.  Inherent Distinctiveness

■ In general, a trade dress may be classified into five categories, in ascending order of protectability: (a) generic; (b) descriptive; (c) suggestive; (d) arbitrary, or (e) fanciful. Two Pesos, 505 U.S. at 768, 112 S.Ct. at 2757 (citing, with approval, Abercrombie & Fitch Co. v. Hunting World, Inc.,

537 F.2d 4, 9 (2d Cir.1976)). A trade dress that falls into any of the latter three categories is considered "inherently distinctive" and, as such, is higher on the protectability ladder than one that is either generic or descriptive. See id. In this circuit, whether a particular trade dress is generic, descriptive or inherently distinctive is typically a question of fact. Equine Technologies, Inc. v. Equitechnology, Inc., 68 F.3d 542, 544 (1st Cir.1995); Boston Beer Co. v. Slesar Bros. Brewing Co., 9 F.3d 175, 180 (1 st Cir.1993). See also Wiley v. American Greetings Corp., 762 F.2d 139, 141 (1st Cir.1985) (recognizing factual nature of inquiry, but finding, as a matter of law, that solid red heart affixed to left breast of teddy bear not inherently distinctive).[11]

■ Defendants, citing a number of cases outside this circuit, argue that the trade dress on Jugs 1 and 1A is either generic or descriptive, as a matter of law, because it uses elements that are common in the maple syrup industry—a one quart, almond-colored Hillside jug with a red plastic lid, trees, sap buckets, a sugarhouse, men collecting sap, and red maple leaves, the symbol of Canada. See Specialty Surgical Instrumentation, Inc. v. Phillips, 844 F.Supp. 1211, 1216 (M.D.Tenn.1994). Also mitigating in their favor, Defendants claim, is the fact that the pictures are used only as a background for a word mark and that the woodland scene depicts merely the source of, and process of harvesting, the product. See Blau Plumbing, 781 F.2d at 610; P.F. Cosmetique, S.A. v. Minnetonka, Inc., 605 F.Supp. 662, 668

9. Section 43(a) of the Lanham Act provides, in relevant part, as follows:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods . . . by another person, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). Although Count II does not specifically mention the above statutory provision, the Court deems it to be duplicative of

Count I and, as indicated, addresses both counts together.

10. There is also a third element that must be met in order for a trade dress to be eligible for protection under section 43(a), that the trade dress be nonfunctional. Two Pesos, 505 U.S. at 769, 112 S.Ct. at 2757–58. The requirement of nonfunctionality has not been specifically addressed by the parties. Accordingly, for purposes here, the Court assumes that it can be met.

11. The Wiley panel also noted that, even on cross motions for summary judgment, if any genuine issues of material fact exist regarding inherent distinctiveness, such issues "must be disposed of by a plenary trial and not on summary judgment." Id. at 140–41.

(S.D.N.Y.1985) (indicating that pictures of plants on beauty aids "are descriptive of the base of the product and indicative of its natural origin"); 1 McCarthy on Trademarks and Unfair Competition § 8.02[4] at 8–24 (3d ed.1995) (discussing generic nature of fishing boat on frozen seafood package). In addition, Defendants assert that there is only a limited number of colors that could be used.

Defendants' position has merit. Thus, as an initial fact-finder, this Court might conclude that Plaintiff's use on its jugs of the common elements of maple syrup harvesting is typical of the industry and thus not entitled to a finding of inherent distinctiveness. (*See, e.g.,* Jugs 6, 7 and 8; Defs.' Ex. 18.[12]) In this vein, the affidavit of Richard Haas ("Haas"), the president of Hillside, is significant. Haas avers that maple trees, sap buckets, sugarhouses and barns are all common elements on maple syrup jugs. (Haas Aff. (attached to Docket No. 53), ¶¶ 11, 16; *see also* Jug Nos. 6, 7 and 8; Defs.' Ex. 18.) Haas also attests that the shape of Hillside's jug is trademarked, that, of the two possible colors, almond is the most popular, and that it is uncommon for labels on maple syrup jugs to have more than two colors. (Haas Aff., ¶¶ 6, 7 and 10.)

This Court, however, is *not* the ultimate fact-finder and, as such, is wary of making, on a unilateral motion for summary judgment (compare *Black Dog Tavern,* 823 F.Supp. at 48), a legal determination on what the First Circuit has specifically entitled, in the majority of cases, "a question of fact." *Boston Beer,* 9 F.3d at 180. *See also Three Blind Mice Designs Co. v. Cyrk, Inc.,* 892 F.Supp. 303, 310 (D.Mass.1995) (resolving inherent distinctiveness issue after bench trial). As Professor McCarthy points out: "The descriptive-suggestive border is hardly a clear one. Its exact location in any given situation is hazy and only subjectively definable." McCarthy, § 11.21 at 11–106.

Instead, drawing on two of the numerous arguments Plaintiff makes in its brief, this Court finds that a reasonable jury could conclude that Plaintiff's trade dress is inherently distinctive. First, Jugs 1 and 1A, unlike Jug 6 for example, do not depict maple syrup. Granted, the combination of a building resembling a sugarhouse, buckets on trees, leaves and a man carrying a bucket may *suggest* maple syrup. However, suggestiveness, as the five-part classification indicates, is not synonymous with descriptiveness. Some imagination, *albeit* slight, is necessary to connect Plaintiff's jugs with their contents. *Compare Equine Technologies,* 68 F.3d at 545 (words "equine technologies" suggests, without describing, hoofpads, even though "u" in "equine" resembled horseshoe).

Second, notwithstanding the commonality of many of the elements of Plaintiff's trade dress, a reasonable jury could conclude that, in combination, such elements render Plaintiff's jugs inherently distinctive. As the Second Circuit recently stated, in a case which Defendants actually cite:

> Trade dresses often utilize commonly used lettering styles, geometric shapes, or colors, or incorporate descriptive elements, such as an illustration of the sun on a bottle of suntan lotion. While each of these elements individually would not be inherently distinctive, it is the combination of elements and the total impression that the dress gives to the observer that should be the focus of a court's analysis of distinctiveness. If the overall dress is arbitrary, fanciful, or suggestive, it is inherently distinctive despite its incorporation of generic or descriptive elements. One could no more deny protection to a trade dress for using commonly used elements than one could deny protection to a trademark because it consisted of a combination of commonly used letters of the alphabet.

12. Jug 6 is the Maple Crest jug referred to at n. 5. Jug 7 is a generic "Massachusetts Pure Maple Syrup" jug. Its design contains the following elements: a red building with a white roof; a wood pile; a number of red maple leaves; green trees with sap buckets attached; and a man with a red hat pouring sap into a bucket. Similarly, Jug 8 is a generic "Pure New Hampshire Maple Syrup" jug. It's design contains: a red building with a white roof; a wood pile; a number of green trees with sap buckets attached; a man with a red hat carrying several sap buckets; another man with a red hat steering a horse-drawn cart; and a red maple leaf reminiscent of the man of the mountain. Defendant's Exhibit 18 is the Rykoff–Sexton jug referred to at n. 7.

*Paddington,* 996 F.2d at 584 (citations omitted). In short, genuine issues of material fact prevent this Court from finding, as a matter of law, that Plaintiff's trade dress is not inherently distinctive.

### 2. *Distinctiveness Through Secondary Meaning*

Because the Court concludes that Defendants are not entitled to summary judgment on the issue of inherent distinctiveness, it need not address whether Jugs 1 and 1A have acquired distinctiveness through secondary meaning. Were such a finding required, however, the Court would conclude, as with the issue of inherent distinctiveness, that genuine issues of material fact exist with respect to this element as well, although the question is close.

■■■ Like the inherent distinctiveness inquiry, whether a trade dress has acquired secondary meaning is a question of fact. *Boston Beer,* 9 F.3d at 180 (citing *Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 816 (1st Cir.1987)). The First Circuit defines secondary meaning as follows:

> Secondary meaning "refers to a [mark]'s ability to tell the public that the [mark] serves a special trademark function, namely, that it denotes a product or service that comes from a particular source. Words and phrases, in ordinary, non-trademark, use normally pick out, or refer to, particular individual items that exhibit the characteristics that the word or phrase connotes (without specific reference to the item's source)."

*Id.* at 181 (quoting *DeCosta v. Viacom Intern., Inc.,* 981 F.2d 602, 606 (1st Cir.1992)). The factors for determining whether a trade dress has acquired secondary meaning include: "(1) the length and manner of its use, (2) the nature and extent of advertising and promotion of the [trade dress] and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the [trade dress] and a particular product or venture." *Id.* at 182. "Survey evidence has become a well-recognized means of establishing secondary meaning." *Id.*

■■■ To this Court, Plaintiff's claim that its jugs have acquired secondary meaning is slim. For example, surveys undertaken by BJ's indicate that there is no brand recognition of a combination of the Maple Grove name together with the design on Jugs 1 and 1A in the minds of BJ's customers. If anything, these jugs seem to be promoting, not the design elements that are the focus of this suit, but the words "maple grove farms," *see Ohio Art Co. v. Lewis Galoob Toys, Inc.,* 799 F.Supp. 870, 883 (N.D.Ill.1992) (when words are used there is even a higher burden to prove secondary meaning), not to mention the farmhouse-barn-silo image within the oval.

On the other hand, there is evidence that Plaintiff's trade dress has been used for a particularly long time, more than eight years. *Cf.* 15 U.S.C. § 1052(f) (in registration context, five years of continued use creates a presumption of secondary meaning). There is also evidence that Plaintiff's dress was widely advertised—having been displayed in some 300,000 catalogues in states where BJ's is located; *but see Cicena Ltd. v. Columbia Telecommunications Group,* 900 F.2d 1546, 1551 (Fed.Cir.1990) (promotional material not necessarily indicative of secondary meaning)—and had an equally wide distribution, with 700,000 jugs having been purchased from BJ's stores.

All of this leads the Court to conclude that, at the very least, there are genuine issues of material fact as to whether the trade dress on Jugs 1 and 1A has acquired secondary meaning. *See Boston Beer,* 9 F.3d at 181 ("Proof of secondary meaning entails vigorous evidentiary requirements."); *Perini Corp. v. Perini Constr.,* 915 F.2d 121, 125 (4th Cir.1990) (same). In any event, analysis of the secondary meaning issue is unnecessary should the Court adopt the above recommendation as to inherent distinctiveness.

### 3. *Likelihood of Confusion*

Although this Court has found genuine issues of material fact on the issue of whether Plaintiff's jugs are distinctive, that does not end the matter. Defendants are still entitled to summary judgment on the unfair competition counts if no reasonable jury

could find a likelihood of confusing Defendants' Jugs 3 or 4 with Plaintiff's Jugs 1 or 1A.[13]

▆ Likelihood of confusion is generally the "key element" of a section 43(a) unfair competition claim. *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 29 (1st Cir.1989); *see also Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 492–93 (1st Cir.1981); *Three Blind Mice*, 892 F.Supp. at 311. In this circuit, likelihood of confusion is typically gauged in light of eight factors: (1) the similarity of the trade dresses; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting the trade dress; and (8) the strength of the plaintiff's trade dress. *See, e.g., Aktiebolaget*, 999 F.2d at 3; *Volkswagenwerk*, 814 F.2d at 817.

▆ While similarity of the trade dress (factor 1) "may be the most important," *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 476 (3d Cir.1994), each factor "requires its own factual findings," *Equine Technologies*, 68 F.3d at 546; *see also Aktiebolaget*, 999 F.2d at 3 (likelihood of confusion is a factual issue). As a result, the First Circuit has only rarely resolved the likelihood of confusion issue at summary judgment. *See, e.g., Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1209 (1st Cir.1983); *Pignons*, 657 F.2d at 492. Finally, there is no requirement that every factor favor the owner of the trade dress in order to determine whether there is a likelihood of confusion. *See Equine Technologies*, 68 F.3d at 546–47.

▆ *Jug 3:* Viewing the evidence most favorably to Plaintiff, there are genuine issues of material fact as to whether there is a

likelihood of confusing Jug 3 with either Jug 1 or Jug 1A. Specifically, a reasonable jury could find that Defendants' use of green trees, red sap buckets, red maple leaves, a man with a red jacket carrying a sap bucket, a wood pile and a red building with a white roof, in conjunction with the name "Red Leaf Farms" on a one quart, almond-colored Hillside jug with a red plastic lid, connotes a similarity to Plaintiff's trade dress (factor 1). Of course, any similarities in the trade dress must be tempered by the Haas affidavit— that maple trees, sap buckets, sugarhouses and barns are all common elements on maple syrup jugs, that almond is the most popular jug color and that most jugs use more than two colors for their designs—which remains undisputed.

A reasonable jury could also find: that the goods (maple syrup) are identical (factor 2); that the channels of trade, advertising and class of prospective purchasers are identical (factors 3–5), both parties' products having been sold on BJ's shelves; that there is, at least, circumstantial evidence, however slight, of improper intent (factor 7), Simons having seen, and Letourneau having access to seeing, Plaintiff's jugs; and that Plaintiff's trade dress, as indicated, is strong (factor 8), having been used in its catalogue for ten years and at BJ's for at least eight years. Faced with such probative evidence on seven factors, it makes no difference if there is little, if nothing, in the way of actual confusion (factor 6).[14]

▆ *Jug 4:* Regarding Jug 4, however, there is clearly insufficient evidence, in this Court's view, to submit the issue of likelihood of confusion to the jury. Thus, Jug 4 represents one of those rare instances in which the likelihood of confusion can be resolved at summary judgment.

First, Jug 4 is substantially less similar to Jugs 1 and 1a than is Jug 3. Specifically, the dominant feature on Jug 4—which, unlike

---

13. As indicated, Defendants' Jug 5 is no longer being challenged.

14. The Court adds one note on "actual confusion." The parties have characterized the relevant customers who might be confused as BJ's shoppers. It makes more sense to this Court to view BJ's itself as the relevant customer. Unlike

many stores, BJ's carries only one brand of a product at a time. For all intents and purposes then, Defendants' product was never shelved at BJ's stores simultaneously with Plaintiff's product; as a result, there was never any real opportunity for BJ's shoppers to have become actually confused.

Jugs 1, 1A and 3, is a half gallon vessel—is a red picket fence on either side of a road. In addition, Jug 4 contains neither men, buildings nor a wood pile. Further, the oval on Jug 4 has been squared off and, unlike Jugs 1 and 1A, Jug 4's background is both open and hilly. Finally, unlike Jug 3, the name "Red Leaf Farms" on Jug 4 is a registered trademark. See Merriam–Webster, Inc. v. Random House, Inc., 35 F.3d 65, 71 (2d Cir.1994) (prominent use of trade names weighs heavily against a finding of confusion based on alleged similarities of packaging); Conopco, Inc. v. May Dep't Stores Co., 46 F.3d 1556, 1568 (Fed.Cir.1994) (similar); Turtle Wax, Inc. v. First Brands Corp., 781 F.Supp. 1314, 1326–27 (N.D.Ill.1991) (similar).

Second, any evidence of an improper intent in Defendants' creation of Jug 3 had virtually evaporated by the time Jug 4 was created. The design for Jug 4 was adopted in July or August of 1994, two months after Maple Grove developed Jug 2 and thus decreased its use of Jugs 1 and 1A. Also, Defendants claim, without dispute, that Jug 4 was designed "as a gesture of good faith," after Plaintiff had objected to the use of Jug 3. In short, in this Court's opinion, no reasonable jury could find a likelihood of confusing Jug 4 with either Jug 1 or 1A.

### 4. Damages

The above analysis is all a prelude to the initial assertion Defendants make in their brief, namely, that Plaintiff cannot demonstrate an entitlement to monetary damages, even assuming liability under section 43(a). Having dealt with the horse (liability), the Court now considers the cart (damages), paying particular attention to cases from this circuit.

Here, as elsewhere, it is more difficult for a plaintiff in a Lanham Act case to demonstrate the right to damages than it is to show the right to injunctive relief. Thus, while "a showing that the defendant's activities are likely to cause confusion or to deceive customers suffices to warrant injunctive relief, ... a plaintiff must show actual

harm to its business, a diversion of sales, for example, in order to recover damages." Camel Hair & Cashmere Institute of America, Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 12 (1st Cir.1986) (citing, with approval, cases from the Second, Seventh and Eighth Circuits). Accord Aktiebolaget, 999 F.2d at 5; Three Blind Mice, 892 F.Supp. at 314.

Defendants assert that the threshold for recovering damages cannot be crossed here since Spring Tree won BJ's business solely because of price based on fair competition. In support of this claim, Defendants note (1) that BJ's "repeatedly" gave Plaintiff a chance to match Defendants' price, (2) that Plaintiff has acknowledged that a competitor "undercut" it, and (3) that BJ's test marketing revealed no difference in sales between Plaintiff's and Defendants' jugs.

Defendants' assertion misconstrues what a reasonable jury could find. Thus, a reasonable jury could determine that, although Cocuzzo had agreed to Defendants' price, BJ's did not accept Defendants' product until it was packaged in a trade dress that was confusingly similar to Plaintiff's trade dress. See Stuart Hall Co. v. Ampad Corp., 51 F.3d 780, 783 (8th Cir.1995) (defendant is not permitted to offer product in a trade dress confusingly similar to the trade dress of a competitor "as a replacement for [plaintiff's] products at a lower price"). As Plaintiff argues, "[a] copier will frequently offer products at a lower price as it does not incur the cost of innovation. The very purpose of intellectual property law is to prevent such unfair competition." (P.'s Brief at 39.)

At bottom, there is, at the very least, a trialworthy issue as to whether Plaintiff's sales of pure maple syrup to BJ's were diverted because of Defendants' allegedly improper activities. Stated another way, this Court believes that a reasonable jury, viewing the facts most favorably to Plaintiff, could find Defendants liable for damages for their allegedly impermissible use of Jug 3.[15]

---

**15.** It is premature to consider the question of attorney fees under 15 U.S.C. § 1117.

## C. *Chapter 93A (Count III )*

 Finally, Plaintiff alleges that Defendants have engaged in unfair and deceptive acts or practices in a trade or commerce in violation of M.G.L. ch. 93A. To this Court, at this time, Defendants actions do not appear to be "immoral, unethical, oppressive or unscrupulous" so as find Chapter 93A liability. *NEC Electronics, Inc. v. New England Circuit Sales, Inc.*, 722 F.Supp. 861, 867 (D.Mass.1989) (citing cases). Nonetheless, since a reasonable jury could find that Defendants engaged in unfair competition in violation of section 43(a), this Court cannot presently recommend that Defendants be granted summary judgment on Court III. *See R.J. Toomey Co. v. Toomey*, 683 F.Supp. 873, 879 (D.Mass.1988) (finding violation of 93A where there is a violation of section 43(a) and citing *Mobil Oil Corp. v. Auto-Brite Car Wash, Inc.*, 615 F.Supp. 628, 631 (D.Mass.1984)). At the very least, there is a genuine issue as to whether Defendants' practice is within "the penumbra of some common-law, statutory, or other established concept of fairness." *NEC Electronics*, 722 F.Supp. at 867 (citations and internal quotation marks omitted).

## V. *CONCLUSION*

To sum up, this Court recommends that, insofar as Plaintiff is seeking a permanent injunction, the motion for summary judgment be ALLOWED. Similarly, the Court recommends that, insofar as Plaintiff in Counts I and II is seeking damages, the motion for summary judgment be ALLOWED, except that the motion be DENIED with respect to Defendants' use of Jug 3. Finally, the Court recommends that, insofar as Plaintiff in Count III is seeking recovery under M.G.L.

ch. 93A, the motion for summary judgment be DENIED.[16]

---

**16.** The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court within ten (10) days of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir.1980); *United States v. Vega*, 678 F.2d 376, 378–79 (1st Cir.1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983). *See also Thomas v. Arn*, 474 U.S. 140, 154–55, 106 S.Ct. 466, 474–75, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.